# Exhibit 1, Part 2

**CONFIDENTIAL**
**Expert Report of Bruce G. Dubinsky**
**December 31, 2021**
**Page 29**

| (in GBP) | 12/31/2012 | 12/31/2013 |
|---|---|---|
| Total Assets | £  1,094,422 | £  580,522 |
| Total Liabilities | (325,220) | (184,125) |
| Equity | £  769,202 | £  396,397 |
| Operating (Loss)/Profit | £  137,644 | £  (478,142) |

**Figure 6 – Financial Snapshot of Old Park Lane**

99. On September 22, 2016, Old Park Lane formally entered into Administration in the United Kingdom.[140]

### 5.    Telesto Markets LLP

100.    Telesto Markets LLP ("Telesto") was authorized in August 2014, but was "dormant" until January 1, 2015, and was a wholesale custody bank and fund administrator.[141]  The company was controlled by Shah.[142]

101.    I reviewed the audited financial statements of Telesto for the three-month period from January 1, 2015 through March 31, 2015.  As shown in the chart below, the company had minimal assets with which to support the purported volume of the Solo Trades. As shown in the chart below, the company never held more than GBP 0.9 million (or approximately USD $1.4 million) in total assets.

---

[140] https://www.fca.org.uk/news/statements/solo-capital-partners-llp
[141] Final Notice, Sapien Capital Limited, Financial Conduct Authority, May 6, 2021, at 13.
[142] Report and Financial Statements for Telesto Markets LLP, March 31, 2015, p. 9.

| (in GBP) | | 3/31/2015 |
|---|---|---|
| Total Assets | £ | 921,533 |
| Total Liabilities | | (25,641) |
| Equity | £ | 895,892 |
| Operating Profit | £ | 656,640 |

**Figure 7 – Financial Snapshot of Telesto**

102.    On September 22, 2016, Telesto formally entered into Administration in the United Kingdom.[143]

### 6.    The Solo Group

103.    The Solo Group includes Solo Capital Partners LLP, Westpoint, Old Park Lane and Telesto which are registered under the laws of England and Wales, and are authorized and regulated by the Financial Conduct Authority of the United Kingdom.[144]

### 7.    Ganymede Cayman Limited

104.    Ganymede Cayman Limited ("Ganymede") is a Cayman entity, owned by Shah, to which the Plans undertook to pay the vast majority of the tax refunds that the Plans obtained from SKAT.[145]  Each Plan paid Ganymede a large percentage of its refund for "tax reclaim advisory services" fees that were supposedly provided by Ganymede.[146]

---

[143] https://www.fca.org.uk/news/statements/solo-capital-partners-llp
[144] ELYSIUM-04117677.
[145] Deposition of Richard Markowitz dated April 8, 2021, 200:24-201:13.
[146] *See*, for example, Tax Reclaim Advisory Services Agreement between Ganymede and California Catalog Company Pension Plan (MPSKAT00022222).

### 8.    The Counterparties To The Solo Trades

105.    Solo Capital used approximately 75 different entities as counterparties in the Solo Trades, the large majority of which (66) were registered in either the British Virgin Islands or the Cayman Islands.  Most of these entities were affiliated with Solo Capital in various ways. Most were newly formed and thinly capitalized entities.  For example, of the 66 entities in the British Virgin Islands and Cayman Islands, 63 were formed during the relevant period – 2012 through 2015.  In addition, many of the entities had overlapping owners and directors.

### a.    The Short-Sellers

106.    Many of the short-sellers were controlled by the same individuals, many of whom were associated with Sanjay Shah and Solo Capital; and multiple members of the Solo Capital management team were shareholders and directors of the short-sellers Leda Cayman Ltd. and Maven Asset Management Ltd.[147]  Shah himself also acted as a director of these entities.[148] Similarly:

- Michael Stephen Murphy, Founder/CEO/Chairman of Novus Capital Markets Ltd,[149] an entity used as a broker in the Solo Trades and also within the Shah-controlled universe,[150] was a shareholder and director of the short-seller entities Baja Ventures Ltd, Nisus Financial Ltd, Sciron Capital Ltd., and Schmet Investments Ltd.[151]

- Dilip Shah, who was employed by Solo Capital in 2011,[152] controlled four short-sellers: Black Square Ltd., DE Market View, Glendale Market Consultants, and RDKS Consultants.[153]

- Rajeev Dave, whom Sanjay Shah refers to as an old friend in internal Solo Capital

---

[147] *See* CAYMAN_00002942-44, CAYMAN_00002940-41  (Leda); CAYMAN_00002984-86, CAYMAN_00002983 (Metis).  *See* ELYSIUM-00150387 for members of Solo's management team.
[148] *See* CAYMAN_00002940-41 (Leda Register of Directors & Officers); CAYMAN_00002983 (Metis Register of Directors & Officers).
[149] ELYSIUM-05443528 (CV).
[150] ELYSIUM-05295222.
[151] BVI_00002791-92 (Baja); BVI_00009073-74 (Nisus); BVI_00011864-65 (Sciron); BVI_00016296; BVI_00016297 (Schmet).
[152] ELYSIUM-03820584.
[153] CAYMAN_00002616-17, CAYMAN_00002615 (Black Square); CAYMAN_00002797-98, CAYMAN_00002796 (DE Market); CAYMAN_00002885-86, CAYMAN_00002884 (Glendale); CAYMAN_00003156-57, CAYMAN_00003155 (RDKS).

correspondence,[154] controlled three short-sellers: A Squared Investments, Abra
Holdings (Cayman), and SPK 23 (Cayman) Inc.[155]

107.    Available evidence of the short-sellers' financial condition shows that the short-sellers
were thinly capitalized and thus undercapitalized to acquire the massive securities holdings
purportedly involved in the Solo Trades.  For example, Solo Capital's Elective Professional
File Review Checklists for Metis and Leda state that each entity will meet the EUR 500,000
threshold for Elective Professional status, but also notes that there is not adequate evidence
of their source of funds.[156]  I have also reviewed the balance sheets for Baja Ventures, Nisus
Financial, and Sciron Capital, each of which shows de minimis capital.[157]  By contrast, Baja
purported to execute 78 of the Solo Trades in 2015, including one purported sale of stock
worth DKK 2,295,475,230 (approximately USD $330 million) and Nisus purported to
execute 73 of the Solo Trades in 2015, including one purported sale of stock worth DKK
2,301,496,431 (approximately USD $330 million).

108.    On April 26, 2016, in connection with the liquidation of each of Baja, Sciron, and Nisus,
Murphy wrote that these entities had "NO financials as the Companies were never used, for
trading or any other purpose."[158]

b.    **Stock Loan Counterparties**

109.    Similar to the short-sellers, the stock loan counterparties were thinly capitalized entities,
many of which were owned by the same individuals and affiliated with Solo Capital or each
other.  For example:

- Martin Smith, who was employed at Novus Capital Markets (an entity
  purportedly used for broker services in the Solo Trades), was a shareholder and
  director of eight of the stock loan counterparties -- Colbrook Ltd, Equal Services
  Ltd., Diverse Vision Ltd., Neoteric Ltd., Prince Solutions, Ltd., Principle Markets

---

[154] ELYSIUM-00088680.
[155] ELYSIUM-01492240, ELYSIUM-01446776, ELYSIUM-01446773 (A Squared); CAYMAN_00002138-40 (Abra); CAYMAN_00000182-84 (SPK 23).
[156] ELYSIUM-00801486; ELYSIUM-00846141.
[157] BVI_00011771-75, BVI_00011776-80 (Baja); BVI_00011761-65, BVI_00009214 (Nisus); BVI_00011751-55, BVI_00011756-60 (Sciron).
[158] BVI_00011951.

Ltd., Trance Services, Ltd., and Treehurst Ltd.[159]

- Bhupendra Mistry, who was affiliated with Solo Capital in various respects, including that he was Sanjay Shah's cousin by marriage,[160] was a shareholder and director of four stock loan counterparties—Fintech Consultancy Ltd, Philo Capital Ltd, TechEvolve Ltd, and and Gnosis Capital Ltd.[161]

- Alex Koerner controlled five of the stock loan counterparties—CEKA Invest GmBH, Relative Value Trading, Rock Capital Private Fund Ltd, RVT Consult GmBH, and Tehvah Global Ltd.[162]

110.    I have reviewed financial statements available for several of the stock loan counterparties, which statements show annual income below 390,000 EUR.[163]

111.    In a November 3, 2015 request that certain of the stock loan intermediaries be put into voluntary liquidation, Martin Smith represented that the companies had no assets.[164] Similarly, the Voluntary Liquidator's Report for the stock loan intermediary Neoteric Ltd noted that the entity held $2.00 USD in cash as of November 17, 2015.[165]

112.    The financial statements for Mistry's four stock loan counterparties show annual income ranging from 135,000 to 674,000 (currency not indicated).[166]

### c.    The Forward Counterparties

113.    The forward counterparties followed the same pattern: thinly capitalized entities in the British Virgin Islands and Cayman Islands that were owned by the same people and/or

---

[159] CAYMAN_00002695-97, CAYMAN_00002694 (Colbrook Ltd); BVI_00004921, BVI_00004919-20 (Diverse Vision Ltd); BVI_00005930-31, BVI_00005932 (Equal Services Ltd); CAYMAN_00003022-23, CAYMAN_00003021 (Neoteric Ltd); BVI_00010547-49 (Prince Solutions Ltd); BVI_00010854-56 (Principle Markets Ltd); BVI_00013858-60 (Trance Services Ltd); BVI_00014445-47, BVI_00014576 (Treehurst Ltd).
[160] *See, e.g.*, ELYSIUM-03495808.
[161] BVI_00006204, BVI_00006203 (Fintech); BVI_00010275, BVI_00010274 (Philo Capital); BVI_00013186, BVI_00013185 (Techevolve); BVI_00006917, BVI_00006916 (Gnosis).
[162] ELYSIUM-03790258 (RVT); BVI_00013460-62, BVI_00013463, BVI_00000006 (Tehvah); ELYSIUM-03790513 (Relative Value); ELYSIUM-09387714, ELYSIUM-09085951 (CEKA); ELYSIUM-06209938 (Rock Capital).
[163] *See,* for example, BVI_00010616-22 (387,500 EUR, Prince Solutions); BVI_00014493-99 (387,500 EUR, Treehurst).
[164] BVI_00004769-70 (referencing Diverse Vision, Equal Services, Prince Solutions, Principle Markets, Trance Services, and Treehurst).
[165] CAYMAN_00003024-26.
[166] BVI_00006057 (135,000, FinTech); BVI_00010140 (135,000, Philo); BVI_00012985 (135,000, TechEvolve); BVI_00006660 (674,000, Gnosis).

affiliated with Solo Capital.

114.   For example:

- David Thomas John Griffiths controlled five forward counterparties: Al Msalli Ltd, Darliz Ltd, LDW Consultants Ltd, Rheidol Trading Ltd, and Ystwyth Trading Ltd.[167]

- Guenther Grant-Klar, who worked at Solo Capital,[168] controlled two forward counterparties, Amalthea Enterprises Ltd and Cork Oak Capital Ltd.,[169] and was also associated with two short-sellers: Leda (as director and shareholder) and Metis (as director).

- Rebecca Robson, who was employed as a Fund Advisor at Solo Capital,[170]  was shareholder and director of four forward counterparties: Allitsen Asset Ltd., Connaught Global Ltd., Gartside Global Ltd., and Lyall Capital Ltd.[171]

- Daksha Bhudia, Sanjay Shah's sister,[172] controlled four forward counterparties: DTS Capital Ltd, Sole Capital Ltd, Stratina Holdings Corp. and T&S Capital.[173]

115.   The 2015 financial statements for Robson's four forward counterparties show de minimis capital.[174]

116.   In December 2015, in connection with the voluntary liquidation of these "shell" companies, Robson wrote that the companies had not been active for two months and that they had no assets or liabilities.[175]  She later stated that the only funds the company ever had came from seed capital.[176]

---

[167] BVI_00000757-58 (Al Msalli); BVI_00000759-60 (Darliz); BVI_00016213, BVI_00016215 (LDW); BVI_00011449, BVI_00011419, BVI_00000006 (Rheidol); BVI_00014734-35, BVI_00000006 (Ystwyth).
[168] ELYSIUM-00150387.
[169] ELYSIUM-01300908 (Amalthea); ELYSIUM-07020244 (Cork Oak).
[170] ELYSIUM-08346929 (Solo employee information).
[171] BVI_00001085, BVI_00001084 (Allitsen Asset Ltd); BVI_00004286, BVI_00004285 (Connaught Global Ltd); BVI_00006492, BVI_00006616 (Gartside Global Ltd); BVI_00008972, BVI_00009032 (Lyall Capital Ltd).
[172] *See, e.g.*, ELYSIUM-00067009.
[173] CAYMAN_00003193-95, CAYMAN_00003192 (T&S); BVI_00005310, BVI_00005309 (DTS); BVI_00012258, BVI_00012254 (Sole); BVI_00005226, BVI_00012613 (Stratina).
[174] BVI_00000994 (Allitsen); BVI_00001017 (Connaught); BVI_00001018 (Gartside); BVI_00001019 (Lyall).
[175] BVI_00001003-BVI_00001005 (December 7, 10, 2015 emails).
[176] BVI_00000998-99 (February 1, 2016 emails).

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 35

### D.    Glossary of key terms and dates

117.    To walk through the Solo Trades at issue in this litigation, it is useful to identify some of the key dates in the dividend calendar related to when a public company declares and pays a dividend on its equity stock.  These dates are important because they are used to determine which shareholder would be entitled to receive any dividends that might be paid by the company in a real-world transaction.

**Declaration date** – The declaration date is the date that the dividend is announced by the company.  On this day, the company will provide information about the size of the dividend, the date of record and the payment date.[177]

**Record date** – The record date is the date on which VP Securities determines which investors are on the share register and therefore entitled to the dividend payment.  At the close of business on the record date, VP Securities takes a snapshot of who is physically holding the shares (the holders of record).[178]

**Ex-dividend date** – The ex-dividend date refers to the first day that a stock trades without a dividend right.  The ex-date typically occurs up to three days before the record date. Purchasers of shares on or after the ex-dividend date are not entitled to receive a dividend.[179]

**Payment date** – The payment date is the date the dividend is actually paid.[180]

---

[177] Important dividend dates, Corporate Finance Institute (2020), https://corporatefinanceinstitute.com/resources/knowledge/finance/important-dividend-dates/ (last visited Nov 30, 2021).
[178] Declaration of Anders Peter Bryde Rasmussen, May 17, 2021, at 8; H. Sorensen 9/21/21 Dep. Tr. at 120:3-17, and 12/7/21 Dep. Tr. at 17:10-25.
[179] Important dividend dates, Corporate Finance Institute (2020), https://corporatefinanceinstitute.com/resources/knowledge/finance/important-dividend-dates/ (last visited Nov 30, 2021).
[180] Important dividend dates, Corporate Finance Institute (2020), https://corporatefinanceinstitute.com/resources/knowledge/finance/important-dividend-dates/ (last visited Nov 30, 2021).

### E.     Dividend Withholding Taxes in Denmark

118.    Under the Danish Withholding Tax Act ("WHTA"), a company that pays dividends is required to withhold a 27 percent dividend tax on behalf of the recipients of the dividend and remit it back to SKAT.[181]

119.    However, there is an exemption available to certain non-Danish shareholders that reside in countries (such as the United States) that have entered into a formal treaty, called a double taxation agreement ("DTA"), with Denmark.[182]  This treaty generally entitles United States-based owners of Danish securities to obtain a full or partial refund on the dividend withholding tax paid on their shares since they will be taxed in the United States on their income earned worldwide.  Qualifying United States pension plans are eligible for a full refund.

120.    When such an exemption applied, an eligible shareholder could submit a claim for a withholding tax ("WHT") refund.  To receive a WHT refund, the shareholder would file a claim by submitting the appropriate forms and supporting documentation to SKAT that proved its eligibility.

121.    For example, if a pension plan located in the United States owned shares in a Denmark-listed company (e.g., Novo Nordisk) on the relevant date, when Novo Nordisk paid a dividend, WHT would be deducted from the dividend by Novo Nordisk and remitted to SKAT.  The pension plan would receive only the net dividend (net of the 27% withholding tax) into its brokerage account.  Under Denmark's double taxation treaty with the United States, the pension plan could request a refund from Denmark on the entire amount of WHT paid.

122.    Between 2012 and 2015, Denmark was subject to a massive WHT fraud orchestrated by Solo Capital.  The fraud, as discussed in greater detail below, involved WHT reclaims worth, in total, approximately DKK 7.2 billion (USD $1.1 billion) that were based on thousands of fictitious stock transactions purportedly executed by a close network of Solo Capital-

---

[181] Danish Withholding Tax Act) § 65.
[182] Convention and Protocol between the United States and Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, U.S.-Den., art. 10, ¶ 2, May 6, 1948, S. Treaty Doc. No. 106-12 (effective date Jan. 1, 2001).

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 37

affiliated entities.[183]

### F.    Background and discussion on legitimate stock lending transactions

123.    Legitimate securities lending is an over-the-counter market that facilitates the borrowing and lending of securities.  Typically, institutional investors such as pension funds, mutual funds and sometimes even charitable foundations will lend their security portfolios in exchange for cash collateral. [184]  The lender will then invest the cash collateral and derive a return, enabling the lender to increase the yield on their portfolio.[185]  Borrowers are typically hedge funds, options traders and other asset managers who borrow securities often for the purpose of covering short-sale positions, which need to be covered due to regulatory requirements in various jurisdictions.[186]  Both parties to the lending transaction generally rely on intermediaries (*e.g.,* custodians and prime brokers) to facilitate the transaction and manage counterparty risk.[187]

124.    To manage the counterparty risk of the stock loan, the borrower provides the lender with cash collateral that is typically greater than the market value of the borrowed securities.[188]  Therefore, in the event of a default by the borrower, the lender can liquidate the collateral and use the proceeds to repurchase the loaned securities in the open market.  In order to ensure that the lender has sufficient collateral, the borrowed securities are typically marked-to-market on a daily basis.[189]  If the market value of the loaned securities increases throughout the loan term, then the initial collateral provided by the borrower may be insufficient and the borrower will be required to provide additional collateral to the lender, and vice versa.[190]  At the end of the loan, the borrowed security and related collateral are then returned to their respective owners.

---

[183] David Segal, *Where in the World Is Denmark's $2 Billion?*, The New York Times, October 5, 2018.
[184] Viktoria Baklanova, Adam Copeland & Rebecca McCaughrin, *Reference Guide to U.S. Repo and Securities Lending Markets*, Federal Reserve Bank of New York Staff Reports, Revised December 2015, at 21-33.
[185] *Id*.
[186] *Id*.
[187] *Id*.
[188] https://www.sec.gov/divisions/investment/securities-lending-open-closed-end-investment-companies.htm (last visited December 23, 2021).
[189] https://www.sec.gov/divisions/investment/securities-lending-open-closed-end-investment-companies.htm (last visited December 23, 2021).
[190] Viktoria Baklanova, Adam Copeland & Rebecca McCaughrin, *Reference Guide to U.S. Repo and Securities Lending Markets*, Federal Reserve Bank of New York Staff Reports, Revised December 2015, at 21-33.

125.    A stock loan transaction is structured legally as a simultaneous agreement between two entities to engage in a sale of securities on the stock loan date, with the repurchase of the securities by the initial stock lender at a later date.[191]  The lender of the securities temporarily passes the legal ownership of the loaned security to the borrower for the duration of the loan.[192]  However, the economic benefit of any corporate actions, such as dividend payments, are rebated back to the lender of the security.[193]  The lender regains legal title to the securities at the end of the loan when the securities are returned.

### G.    Background on the use of legitimate forward/future transactions as a hedge

126.    A forward contract represents a commitment to buy or sell an asset (such as a stock) at a specified price (the forward price) and on a specified date (the maturity date). [194]  Forward contracts are traded over-the-counter (not on exchanges).

127.    Forward contracts usually do not require payment until the maturity date.  However, counterparties typically require two-way collateral agreements in which a daily mark-to-market assessment of the position is performed, and any unrealized losses incurred by the purchaser of the forward contract is paid to the other party.  The two-way contract also means that if the seller of the forward is on the losing side of the transaction, it makes collateral payments to the purchaser.[195]

128.    Futures contracts are similar to forward contracts, except that a futures contract is an exchange-traded, standardized contract that is settled daily (not just at maturity), meaning that futures contracts can be transacted at any time.[196]

129.    When investors enter a futures contract, they are required to pay a margin deposit (or a performance bond) as collateral to ensure that both parties can meet their obligations under

---

[191] *Id*.
[192] *Id*.
[193] *Id*.
[194] Futures and Forwards, Corporate Finance Institute,
https://corporatefinanceinstitute.com/resources/knowledge/finance/futures-forwards// (last visited Nov 30, 2021).
[195] Laura E. Kodres, *Hedge Fund Investment Strategies*, Hedge Fund and Financial Market Dynamics, International Monetary Fund, May 15, 1998, at 49.
[196] Futures and Forwards, Corporate Finance Institute,
https://corporatefinanceinstitute.com/resources/knowledge/finance/futures-forwards// (last visited Nov 30, 2021).

the contract.[197]  Margin requirements are set by the exchange on which the futures contract is traded, not by the individual brokerage firms (although some brokerage firms may set higher margin rates than what is stipulated by the exchanges).  Standard margin requirements can range from 5 percent to 20 percent, depending on the specific country and contract being traded, although some contracts may have lower margin requirements.[198]  Therefore, unfavorable price movements could result in a demand to post additional margin funds.  If an investor fails to meet a margin call, its brokerage firm may close out of the futures position or sell other assets held in the account to cover the margin deficiency.

130.    Investors typically use forwards and futures contracts as part of a "hedging strategy" to lock in a purchase or sale price of a stock in advance, thereby removing the uncertainty about any subsequent changes in the market price of the underlying stock and eliminating the risk of any unexpected losses.

## VI.    OPINION NO. 1: THERE IS NO EVIDENCE THAT THE PLANS EVER OWNED ACTUAL SHARES OF DANISH SECURITIES FROM THEIR SOLO TRADES, OR RECEIVED ACTUAL DIVIDENDS ISSUED BY THE DANISH COMPANIES WHOSE STOCK WAS PURPORTEDLY USED IN THE SOLO TRADES

131.    I have reviewed and analyzed the evidence available in this case to determine whether there is any indication that the Plans purchased or owned actual Danish securities or received actual dividends issued by Danish companies.  Among the steps taken, I reviewed (i) representations made by or on behalf of Solo Capital concerning the identity and location of any sub-custodians used by the Solo Custodians to custody Danish securities purportedly owned by the Plans and documents related thereto;[199] (ii) Solo Capital's business records for any indicia of share ownership; (iii) Solo Capital's bank records for any indication of dividend receipt; and (iv) each leg of the Solo Trades to determine whether actual shares

---

[197] https://www.finra.org/investors/learn-to-invest/types-investments/security-futures (last visited December 8, 2021).

[198] https://www.finra.org/investors/learn-to-invest/types-investments/security-futures (last visited December 8, 2021); s*ee also* https://www.theice.com/publicdocs/futures/Futures_Europe_Single_Stock_Futures_KID.PDF (last visited December 13, 2021)

[199] Solo Capital was purportedly the prime custodian for the Solo Trades for the Plans and then supposedly entered arrangements with others to act as sub-custodians.  *See* ELYSIUM-03283228; ELYSIUM-04117677; *see also* discussion *infra* regarding the sub-custodians.

existed. Based on my review and analysis as set out in greater detail below, I have concluded that the Solo Trades did not involve the purchase or ownership of any actual Danish securities, and that the Plans did not receive any actual Danish dividends.

### A. The sub-custodians identified by Solo Capital confirmed that they did not hold any shares of Danish securities on behalf of the Solo Custodians during the relevant period.

132.    A custodian in a financial market is an institution (such as a bank) that holds securities, for safekeeping and clearing, on behalf of its customers. The custodian also arranges for the settlement and deliveries of any securities transactions and administers the collection of dividends. Custodian banks are often referred to as global custodians if they maintain assets for their customers in multiple jurisdictions around the world, using their own local branches or other local custodian banks ("sub-custodian") with which they contract to be in their global network in each market to hold securities for their respective customers.

133.    Therefore, any securities that were purchased by the Plans would have ultimately been held by the Solo Custodians or any sub-custodians used by the Solo Custodians. If the Plans had actually held any positions in Danish securities, or received dividend payments from Danish companies, the Solo Custodians, or their sub-custodians, would maintain records of the transactions reflecting that the shares were in fact received and held in custody and that dividends were in fact received.

134.    As far as I am aware, Solo Capital, at various times, has identified three possible financial institutions that acted as sub-custodians for holdings of Danish securities for Solo Capital's clients. In related proceedings in England, Shah claimed that Solo Capital had a sub-custodian arrangement with JPMorgan Chase from August 2012 through October 2013, and a sub-custodian arrangement with Skandinaviska Enskilda Banken AB ("SEB") from July 2013 through April 2014.[200] Additionally, in response to an inquiry from Solo Capital's regulator in England, the Financial Conduct Authority, Solo Capital's legal counsel Reed Smith, LLP represented in a letter dated March 11, 2016 that the Zurich Branch of Société Générale SA ("Société Générale") was the only sub-custodian used by the Solo Custodians to

---

[200] Sanjay Shah Defendants' Response to Claimant's Request Dated 4 June 2019 for Further Information Under CPR 18, pgs.4-5, 11, 15.

sub-custody Danish securities for the period of January 1, 2014 to August 24, 2015.[201]

135.    I searched the voluminous business records obtained by court order from Solo Capital's records in Dubai and produced in this litigation for additional evidence of any other custodians or sub-custodians for the Danish equities that were supposedly purchased in the Solo Trades and owned by the defendant Plans and was unable to find any such evidence.

136.    I also reviewed the custodial records from Solo Capital's accounts at Société Générale that were obtained through discovery in this litigation and noted that there were no transactions or positions in the purported Danish equities in the Solo Trades that were held on behalf of the Solo Custodians for the Plans.[202]  Furthermore, both JPMorgan Chase and SEB provided sworn affidavits attesting to the fact that they performed an internal review of their own records and found no evidence that they held any of the relevant Danish securities on behalf of the Solo Custodians during the relevant period or had any record of receiving dividends from the Danish companies they were asked to search for.[203]

137.    I am unaware of any credible explanation for the lack of Danish holdings on behalf of the Solo Custodians at the sub-custodians identified by Shah other than that no such shareholdings ever existed.

138.    Based on this evidence, or lack of evidence, alone, I have concluded that the Plans never owned the Danish shares they purported to own from the Solo Trades, nor did they ever receive the dividends from the Danish companies.

###    B.    No evidence of legitimate trading was found in Solo Capital's business records

139.    If, as Sanjay Shah contends, the Solo Custodians used sub-custodians to custody the Plans' Danish securities, based on my experience I would expect the business records of the Solo Custodians to contain voluminous documents reflecting the custody of those shares at the sub-custodians.  For example, I would expect to find certain records from third parties unrelated to the Solo Custodians, such as:

---

[201] ELYSIUM-05327063.
[202] *See* SCPADMINISTRATORS_00000096 through SCPADMINISTRATORS_00002911.
[203] Declaration of Matthew J. Totman, December 15, 2021; Declaration of Anders Peter Bryde Rasmussen, May 17, 2021.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 42

- Custodian records evidencing the actual shares being held

- Account statements from the various sub-custodians

- Evidence that the securities were received/delivered

- Receipt of cash from the issuer or a custodian in the custodial chain on or near the dividend payment date

- SWIFT confirmations (which are typically generated when there is an international cash transfer and includes all the details of the transaction including date, amount, currency, sender, and recipient) as evidence of cash collateral being sent/received from the stock loans

- Evidence of additional cash collateral being sent/received related to the mark-to-market daily margin calls on the loans as the stock price fluctuated throughout the loan term

- Email or other communications between Solo Capital and any sub-custodians regarding the massive securities holdings during a four-year period

140.    I would further expect to find internal record keeping, such as ledgers or spreadsheets, tracking the Solo Custodians' securities holdings at each of the sub-custodians.

141.    I understand that through proceedings in England and Dubai, SKAT obtained records, in the form of electronic and hardcopy material, from Elysium Global (Dubai) Limited, an entity within the Shah-controlled universe.[204]  Not surprisingly, given the volume and scope of the Solo Trades, there were more than 10 million records seized in total.  In addition, through the US litigation, SKAT obtained additional records from the Solo Custodians' administrators in England, which included bank statements from financial institutions at which the Solo Custodians held accounts, internal Solo Custodian documents held at an offsite storage facility, and correspondence with counsel for the Solo Custodians' in connection with an investigation by the Financial Conduct Authority.

142.    I have performed an extensive search through the business records of the Solo Custodians.  Among other things, I searched for the type of records described herein.  Based on that review, I have seen no evidence that the Solo Custodians received or custodied any

---

[204] ELYSIUM-05295222.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 43

Danish securities for the Plans, nor any evidence that the Solo Custodians used any sub-custodians to custody any such securities.

143.     Similarly, based on a review of the Solo Custodian's bank records, I have seen no evidence that they received, on behalf of the Plans, actual dividend payments arising from the ownership of Danish shares, either from Danish issuers directly or from other custodian institutions.

144.     By contrast, my review of the Solo Custodians' business records shows that the Solo Custodians kept detailed records of the paper trades described in subsection (c) below, and of the payments made to the various participants of the scheme.

145.     The lack of any third-party evidence or business records reflecting holdings of actual securities and the lack of receipt of actual dividends underscores my conclusion that the Solo Trades did not include any actual Danish securities or dividends.

### C.     The Solo Trades were pre-arranged, inter-dependent, circular, paper transactions in which no actual securities were bought or sold

146.     As part of my analyses, I reviewed records related to all 2,559 of the Solo Trades purportedly orchestrated by Solo Capital on behalf of the Plans.  Based on this review, I concluded that the Solo Trades gave the appearance that the Plans purchased Danish securities, but in fact no actual Danish securities were bought or sold.  Rather, in each case, the Plan purportedly purchased the securities from a short-seller—i.e., a counterparty that did not own any Danish securities at the time of each purported sale.  To "cover" the short in order to be able to deliver the securities to the Plan on the settlement date, the seller purportedly borrowed the shares, but in each case the shares were borrowed in essence from the very Plan that purportedly purchased those shares from the seller.  The seller never had any shares to sell, and the Plan never acquired any shares to lend.  In short, Solo Capital attempted to create shares out of thin air.

147.     In order to generate a paper trail, each of the purported Solo Trades involved a similar closed loop, circular trading pattern, involving (1) ostensibly the purchase of Danish equity securities, (2) the use of purported stock loans to finance the purchases by Plans that otherwise had no money, and (3) purported forward/futures hedging transactions, all related to certain Danish equities structured around their respective dividend payment dates.  After

the dividend payment date, the purported trades were subsequently reversed over several weeks or months to close out the position. The only "profits" earned by the Plans were generated through the receipt of WHT refunds ultimately received from SKAT, net of substantial fees drained from the refund proceeds by Solo Capital and others. There were no material profits generated from the purported trading activity itself. In fact, in each case, the paper transactions were designed to net to zero for the trading counterparties.

148.    As discussed further below, each of the Solo Trades are characterized by the same trading pattern. From August 2012 through December 2013, the transactions purportedly executed by the Plans followed what I refer to as a "Simple Trading Loop". Beginning in March 2014, Solo Capital added an additional layer of counterparties and brokers to the circular trading pattern and followed what I refer to as a "Complex Trading Loop" (*see* discussion *supra* regarding simple and complex loop Solo Trades).

149.    The parties to each leg of the securities purchases, stock loans, and forward hedges were entities that "on-boarded" with the Solo Custodians, and thus were all "trading" exclusively on the Solo Capital platform. Importantly, none of these thousands of transactions were executed with parties in the open market.

150.    Accordingly, it is my conclusion that all 2,559 of the Solo Trades were basically clones of each other; all were closed loop, circular paper transactions with no actual securities traded.[205]

### 1.    Analysis of the Solo Trades purportedly executed by the Plans

151.    Upon my request, I was provided a list from Counsel of the 2,559 refund claims submitted to SKAT by the Defendants from August 2012 to April 2014. Each refund claim filed by the Defendants was linked to a unique series of transactions which resulted in the purported receipt of a dividend by the Plans. This is what I have defined as the Solo Trades. For each refund claim for each security purportedly owned by each Plan, I searched for and

---

[205] I used the term clones to describe the basic structure in all the Simple Loop Solo Trades and basic structure in all the Complex Loop Solo Trades being virtually identical in form, with varying use of different Danish equities, forwards and futures and stock loan terms and pricing. The fact that the Solo Trades used different equities at times, different stock loan pricing, different forward pricing, etc, does not undercut that they were all clones of one another that were all pre-designed and executed on paper to obtain false tax refunds from SKAT.

analyzed the trading records created and maintained by Solo Capital for each leg of the trading loops.

152.    The Simple Trading Loops were used from August 2012 through December 2013, with the first purported trades occurring on August 8, 2012.[206]  From August 8, 2012 through December 26, 2013, Solo Capital orchestrated 319 Simple Trading Loops for 42 Plans, which resulted in 319 dividend refund claims being filed with SKAT.

153.    For each of the 319 Simple Trading Loops, the trade confirmations generated by Solo Capital, or a similar document, to create the documentation for the complete list of the Simple Trading Loops were reviewed and analyzed.  This included documents relating to the individual transactions needed to complete each of the 12 steps for the 319 Simple Trading Loops.  These documents include the following datapoints for each of the 12 transactions that comprised the Simple Trading Loops:

- The name of the broker or counterparty
- Trade Date
- Settlement Date
- Price
- Quantity

154.    Beginning in March 2014, Solo Capital added additional layers to the trading loops resulting in an 18-step Complex Trading Loop.  The Complex Trading Loops followed a similar methodology to the Simple Trading Loops but purportedly funneled each type of trade through two intermediary brokers instead of one.  This new step has no apparent business purpose other than to provide an additional layer of complexity to the extent any regulator inquired about the Solo Trades.  From March 4, 2014 through May 11, 2015, Solo Capital orchestrated 2,240 Complex Trading Loops for 166 Plans which resulted in 2,240 dividend refund claims begin filed with SKAT.

155.    Utilizing the same methodology as the Simple Trading Loops, the trade confirmations generated by Solo Capital, or a similar document, for the complete list of the 2,240 Complex Trading Loops, which included documents relating to the individual transactions needed to complete each of the 18 steps for the 2,240 Complex Trading Loops were reviewed and

---

[206] For example, see ELYSIUM-00604753; ELYSIUM-00604951; ELYSIUM-06094123; ELYSIUM-00604746.

analyzed.  These documents contained the same datapoints for each of 18 transactions that comprised the Complex Trading Loops:

- The name of the broker or counterparty
- Trade Date
- Settlement Date
- Price
- Quantity

156.    The datapoints collected for each transaction were used to map out each Simple Trading Loop and Complex Trading Loop that took place from August 8, 2012 to May 11, 2015. Exhibit 3 displays the data collected for the transactions related to the Bellwether Plans.

157.    This analysis allowed me to determine if all the transactions comprising both the Simple Trading and Complex Trading Loops were essential replicas of each other, and whether any of the Solo Trades involved the purchase of actual securities by the Plans.  After conducting the review and analysis, I concluded that the transactions were in fact essentially replicas of each other, and that none of the Solo Trades involved the purchase of actual securities by the Plans.

### 2.    Sample "Simple loop" transaction purportedly executed by the Bernina Plan

158.    On March 21, 2013, the Bernina Plan purportedly purchased 600,000 shares of Carlsberg A/S – B ("Carlsberg") stock from an entity called D.D.C. Cayman.  Upon review of the supporting documentation underlying this transaction and a search of Solo Capital's records, there is no evidence that D.D.C. Cayman owned any shares in Carlsberg at the time of the sale.  Thus, at the time of the sale, D.D.C. Cayman was a short-seller, and would have to acquire the shares to cover the short in time for delivery to the Bernina Plan on the settlement

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 47

date.[207]  D.D.C. Cayman, however, did not obtain any shares from the market to cover the short.  Rather, as demonstrated below, D.D.C. Cayman purportedly borrowed the shares from the Bernina Plan itself (through a two-step lending transaction).  The Bernina Plan also did not have any Carlsberg shares to lend, making this a completely circular and fabricated securities transaction.  Below I set out each leg of the circular loop.



**Figure 8 – No evidence that any shares of Carlsberg stock entered the trading loop**

  a.  **Trade Approval 1: FGC Securities LLC purportedly purchased shares in Carlsberg from D.D.C. Cayman in March 2013**

159. On March 21, 2013, FGC Securities LLC, acting as broker, purportedly purchased 600,000 shares of Carlsberg at a price of DKK 586.3316 per share from D.D.C. Cayman for

---

[207] While it is possible for an investor to sell shares that the investor does not yet own (referred to as a "short sale"), the investor must acquire the shares (referred to as "covering the short") before the delivery date of those shares. Short sales executed without having previously acquired the right to obtain the shares before the delivery date is referred to as a "naked short" or "uncovered short."  In the EU, the *EU Short Selling Regulation* which came into effect in November 2012 prohibits uncovered short selling of listed shares in Europe, other than by market makers or banks involved in the issuance of government bonds.  *See*, https://www.icmagroup.org/Regulatory-Policy-and-Market-Practice/repo-and-collateral-markets/icma-ercc-publications/frequently-asked-questions-on-repo/30-what-is-short-selling-and-what-is-the-role-of-repo/ (last visited December 9, 2021); *see also*, Regulation (EU) No 236/2012 of the European Parliament and of the Council of 14 March 2012 on short selling and certain aspects of credit default swaps, Official Journal of the European Union, March 24, 2012.

a total USD equivalent of $61.1 million.[208]  The trade was arranged by and "approved" by Solo Capital.



| From: | <solotradeapprovals@solo.com> |
| To: | <omitchell@ddccayman.com>, <poakley@ddccayman.com> |
| Cc: | <execution@fgcsecurities.com>, <operations@fgcsecurities.com>, <solotradeapprovals@solo.com> |
| Subject: | Account (DDC01) - Trade Approved |
| Sent: | Thu, 21 Mar 2013 13:12:15 +0000 |

Dear Client,

In relation to the trade refered to below (**Trade**), Solo Capital Partners LLP approves such Trade (in accordance with the Addendum to the International Uniform Brokerage Execution Services Agreement: Trader Version 2008) on the following basis:

(i) You may seek liquidity for the Trade (via the Broker that you have identified), and

(ii) If appropriate liquidity is found, the Trade is executable in its entirety only (that is, on a fill or kill basis) - partial execution of the Trade is not approved.

Subject to (i) and (ii) above, Solo Capital Partners LLP will irrevocably accept to effect the clearing of the Trade.

In case of any queries, please contact custody@solo.com.

Global Securities Services

**Solo Capital Partners LLP**

Details of Trade:

| | | | |
|---|---|---|---|
| **Trade Type** | Sell | Client: | D.D.C. Cayman |
| **Ticker** | CARLB DC | Broker: | FGC Securities LLC |
| **Instrument** | Equity | Trade Type: | Sell |
| **Currency** | DKK | Ticker: | CARLB DC |
| **Price** | 586.3316 | Instrument: | Equity |
| **Quantity/Contracts** | 600,000 | Quantity: | 600,000 shares |
| **Shapes** | **Shape 1** 600,000 | Price: | DKK 586.3316 |
| **Notional** | 351,798,960.0000 | Notional: | DKK 351,798,960.00 |
| **Trade Date** | 21/03/2013 | Trade Date: | March 21, 2013 |
| **Settlement Date** | 27/03/2013 | Settlement Date: | March 27, 2013 |
| **Broker** | FGC Securities LLC | | |

**Figure 9 – Trade Confirmation from Solo Capital to D.D.C. Cayman[209]**

160.    As noted above, there is no evidence that D.D.C. Cayman ever actually owned these shares of Carlsberg since the sub-custodians acting for Solo Capital, who were supposedly acting as the custodian for the shares, have either affirmatively stated in sworn affidavits that they never had any record of the shares existing in their custody systems and/or provided

---

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 49

documents showing that no such shares existed in their share custody systems. Also as noted above, based on my thorough review of Solo Capital's business records, I have not seen any documentation reflecting the transfer of Carlsberg shares from the market into D.D.C. Cayman's account at Solo Capital.

       **b.**     **Trade Approval 2: The Bernina Plan purportedly purchased shares in Carlsberg from FGC Securities LLC in March 2013**

161.    On March 21, 2013, which is the same trade date – and only <u>5 seconds</u> after the D.D.C. Cayman transaction in the preceding step – the Bernina Plan purportedly purchased the same number of shares in Carlsberg at the <u>exact same price</u> from FGC Securities LLC, acting as broker.[210] It is apparent from the timing and details of this trade and the prior trade that the Bernina Plan purportedly purchased the Carlsberg securities from D.D.C. Cayman through the broker FGC Securities LLC.

---

[210] ELYSIUM-01463894.

CONFIDENTIAL
Expert Report of Bruce G. Dubinsky
December 31, 2021
Page 50



| From: | solotradeapprovals@solo.com |
|---|---|
| To: | adam@Berninap.com |
| Cc: | execution@fgcsecurities.com, operations@fgcsecurities.com, solotradeapprovals@solo.com |
| Subject: | Account (BER01) - Trade Approved |
| Sent: | Thu, 21 Mar 2013 13:12:20 +0000 |

Dear Client,

In relation to the trade referred to below (*Trade*), Solo Capital Partners LLP approves such Trade (in accordance with the Addendum to the International Uniform Brokerage Execution Services Agreement: Trader Version 2008) on the following basis:

(i) You may seek liquidity for the Trade (via the Broker that you have identified), and

(ii) If appropriate liquidity is found, the Trade is executable in its entirety only (that is, on a fill or kill basis) - partial execution of the Trade is not approved.

Subject to (i) and (ii) above, Solo Capital Partners LLP will irrevocably accept to effect the clearing of the Trade.

In case of any queries, please contact custody@solo.com.

Global Securities Services

**Solo Capital Partners LLP**

Details of Trade:

| | |
|---|---|
| **Trade Type** | Buy |
| **Ticker** | CARLB DC |
| **Instrument** | Equity |
| **Currency** | DKK |
| **Price** | 586.3316 |
| **Quantity/Contracts** | 600,000 |
| **Shapes** | **Shape 1** 600,000 |
| **Notional** | 351,798,960.0000 |
| **Trade Date** | 21/03/2013 |
| **Settlement Date** | 27/03/2013 |
| **Broker** | FGC Securities LLC |

Client: The Bernina Plan

Broker: FGC Securities LLC

Trade Type: Buy

Ticker: CARLB DC

Instrument: Equity

Quantity: 600,000 shares

Price: DKK 586.3316

Notional: DKK 351,798,960.00

Trade Date: March 21, 2013

Settlement Date: March 27, 2013

**Figure 10 – Trade Confirmation from Solo Capital to the Bernina Plan[211]**

162.    The use of the broker FGC Securities LLC has no apparent business purpose other than to create an air of legitimacy to the trade.  Typically, a broker serves in one or both of two capacities—execution of the trade in the market, and/or clearing the trade.  In the Solo Trades, the brokers only purported to function as an executing broker,[212] rather than as a clearing broker, as the Solo Custodians purportedly served as the clearing institutions.  However, there was no need for an executing broker because the counterparties did not need

---

[211] ELYSIUM-01463894.

[212] Markowitz Tr. at 272:18 – 273:19 (discussing MPSKAT000010004 (Ex. 2143)); Lehman Tr. at 64:24 – 65:18.

to seek liquidity from the open market.  Rather, Solo Capital pre-selected the counterparties to each trade from among the counterparties that had "on-boarded" to the Solo Capital platform and determined the volume of each trade.  As a result, the brokers such as FGC Securities LLC served no legitimate function.[213]



**Figure 11 – The Bernina Plan Solo Trade**

c.    **Stock Loan 1: The Bernina Plan purportedly loaned the Carlsberg shares it purchased to Colbrook Limited in March 2013**

163.    The Bernina Plan purportedly entered into a securities lending agreement with Colbrook Limited, [214] under which the Bernina Plan agreed to loan the very same shares in Carlsberg that it purchased from FGC Securities LLC.  The loan transaction settled on March 27, 2013, the same settlement date as the purported purchase of the shares.[215]

---

[213] Consistent with my conclusions on the role of the brokers in the Solo Trades, the Financial Conduct Authority in England has fined two of the purported brokers involved in the Solo Trades:  Sunrise Brokers and Sapien Capital Limited.  In each report on its findings, the FCA stated that it "refers to the Solo Trading as 'purported' as it has found no evidence of ownership of the shares by the Solo Clients, nor custody of the shares or settlement of the trades by the Solo Group. This, coupled with the high volumes of shares purported to have been traded, is highly suggestive of sophisticated financial crime." *See* Financial Conduct Authority, Final Notice to Sapien Capital Limited, May 6, 2021; Financial Conduct Authority, Final Notice to Sunrise Brokers LLP, November 12, 2021.
[214] Colbrook Limited was one of eight stock loan counterparties for which Martin Smith was a shareholder and director.  Smith was also employed by Novus Capital Markets, a purported broker for the Solo Trades.  See paragraph 109.
[215] ELYSIUM-01487961.

| From: | <solotradeapprovals@solo.com> |
|---|---|
| To: | <adam@Berninap.com> |
| Cc: | <solotradeapprovals@solo.com> |
| Subject: | Account (BER01) - Trade Approved |
| Sent: | Tue, 26 Mar 2013 13:52:58 +0000 |

Dear Client,

Please accept this email as confirmation that the below stock loan transaction has been approved and booked to your Solo Capital Partners LLP custody account.

In case of any queries, please contact custody@solo.com.

Global Securities Services

**Solo Capital Partners LLP**

Details of Stock Loan Transaction:

| Trade Type | | |
|---|---|---|
| **Ticker** | CARLB DC | Client: The Bernina Plan |
| **Instrument** | Equity | |
| **Currency** | DKK | Counterparty: Colbrook Limited |
| **Price** | 586.3316 | |
| **Quantity/Contracts** | 600,000 | Trade Type: Stock Loan |
| **Shapes** | **Shape 1** 600,000 | |
| **Notional** | 351,798,960.0000 | Ticker: CARLB DC |
| **Trade Date** | 26/03/2013 | |
| **Settlement Date** | 27/03/2013 | Instrument: Equity |
| **Side** | Lend | |
| **Haircut** | None | Quantity: 600,000 shares |
| **Term** | Open | |
| **Cash Rebate Interest** | Overnight DKK Libor | Price: DKK 586.3316 |
| **Cash Rebate Spread** | +70 | |
| **Stock Rebate Interest** | Overnight DKK Libor | Notional: DKK 351,798,960.00 |
| **Stock Rebate Spread** | +19.75 | |
| **Cash Pool Type** | fixed | Trade Date: March, 26, 2013 |
| **Dividends** | 100% | |
| **Counterparty** | Colbrook Limited | Settlement Date: March 27, 2013 |

**Figure 12 – Stock Loan Confirmation from Solo Capital to the Bernina Plan**[216]

164.    As part of the loan transaction, Colbrook Limited agreed to provide cash collateral to the Bernina Plan representing the full market value of the shares borrowed.  However, the stock price (and therefore the amount of collateral provided by Colbrook Limited) that the loan agreement was premised on was the price that the Bernina Plan had purchased the shares from D.D.C. Cayman on March 21, 2013 – rather than the market price as of the date of the stock loan on March 26, 2013.

---

[216] ELYSIUM-01487961.

**CONFIDENTIAL**
**Expert Report of Bruce G. Dubinsky**
**December 31, 2021**
**Page 53**

165.    Furthermore, the stock loan step in each of the Solo Trades takes place at the same price the security was purchased at (several days earlier), rather than at the market price as of the date of the stock loan.  And regardless of what actually happened in the market to the stock price between the purchase date and the stock loan date, the purported stock lender in the Solo Trades would always enter the loan transaction based on the purchase price from days earlier.

166.    This does not comport with how securities lending works in the real world.  The price of the Carlsberg shares between March 21, 2013 and March 26, 2013 could have certainly moved during that period, which would impact the pricing and related terms of the stock loan transaction.  The stock loan transactions in the Solo Trades never took such market movements into account.

167.    In fact, the closing stock price of Carlsberg on March 26, 2013 declined by DKK 13.33 per share since the purported stock purchase on March 21, 2013.[217]  As a result, the total market value of the 600,000 shares that the Bernina Plan purportedly loaned to Colbrook Limited would have declined by DKK 7,998,960 (or approximately USD $1.4 million).  Given that the collateral purportedly provided by Colbrook Limited was based on the stock price as of March 21, 2013 rather than March 26, 2013, the drop in the stock price between the two dates resulted in Colbrook Limited purportedly providing the Bernina Plan with approximately DKK 8.0 million in excess collateral.

---

[217] http://www.nasdaqomxnordic.com/shares/historicalprices (last visited December 28, 2021).



**Figure 13 – The Bernina Plan Solo Trade**

168.     I have reviewed the Solo Capital account statement for the Bernina Plan, which statement shows that the Bernina Plan deposited no funds into its Solo Capital trading account prior to its purported purchase of the Carlsberg securities, and had a zero cash balance at the time of the purchase.[218]  The purpose of the stock loan was to ostensibly show that the Bernina Plan, a newly formed entity, had sufficient liquidity, via the cash collateral it purportedly received from Colbrook Limited, to actually fund the purchase of DKK 351,798,960.00 worth of Carlsberg stock at settlement on March 27, 2013.[219]

        d.     **Stock Loan 2: Colbrook Limited purportedly loaned the Carlsberg shares it borrowed to D.D.C. Cayman**

169.     Colbrook Limited then simultaneously loaned the same shares that it just borrowed from

---

[218] See **Table 1**.
[219] As of March 27, 2013, the Bernina Plan had a bank account balance of only $5,000 in its JPMorgan Chase account, *see* MPSKAT00001580 at 1581.  Not only would that balance be entirely insufficient to fund the stock purchase, it was also never transferred to the Solo Capital account.

the Bernina Plan to D.D.C. Cayman.[220] The trade approval email for this transaction was sent just 1 second after the stock loan transaction it purportedly entered with the Bernina Plan.[221]

**From:** <solotradeapprovals@solo.com>
**To:** <martin.smith@colbrooklimited.com>
**Cc:** <solotradeapprovals@solo.com>
**Subject:** Account (COL01) - Trade Approved
**Sent:** Tue, 26 Mar 2013 13:52:59 +0000

Dear Client,

Please accept this email as confirmation that the below stock loan transaction has been approved and booked to your Solo Capital Partners LLP custody account.

In case of any queries, please contact custody@solo.com.

Global Securities Services

**Solo Capital Partners LLP**

Details of Stock Loan Transaction:

| | |
|---|---|
| **Trade Type** | |
| **Ticker** | CARLB DC |
| **Instrument** | Equity |
| **Currency** | DKK |
| **Price** | 586.3316 |
| **Quantity/Contracts** | 600,000 |
| **Shapes** | **Shape 1** 600,000 |
| **Notional** | 351,798,960.0000 |
| **Trade Date** | 26/03/2013 |
| **Settlement Date** | 27/03/2013 |
| **Side** | Lend |
| **Haircut** | 0 |
| **Term** | Open |
| **Cash Rebate Interest** | DKK LIBOR SPOT NEXT |
| **Cash Rebate Spread** | 70 |
| **Stock Rebate Interest** | DKK LIBOR SPOT NEXT |
| **Stock Rebate Spread** | 19.75 |
| **Cash Pool Type** | fixed |
| **Dividends** | 100% |
| **Counterparty** | DDC CAYMAN LIMITED |

Client: Colbrook Limited

Counterparty: DDC Cayman Limited

Trade Type: Stock Loan

Ticker: CARLB DC

Instrument: Equity

Quantity: 600,000 shares

Price: DKK 586.3316

Notional: DKK 351,798,960.00

Trade Date: March, 26, 2013

Settlement Date: March 27, 2013

**Figure 14 – Stock Loan Confirmation from Solo Capital to Colbrook Limited**[222]

170. The main terms of the loan agreement – the number of shares, price, trade date and

[220] ELYSIUM-01487958.
[221] ELYSIUM-01487961.
[222] ELYSIUM-01487958.

settlement date – were the exact same as the terms of the stock loan agreement between the Bernina Plan and Colbrook Limited.[223]

171.    The overall impact of this transaction, in aggregate, is that the Bernina Plan nearly simultaneously (1) purchased DKK 351,798,960 worth of Carlsberg stock from D.D.C. Cayman; and (2) loaned the same DKK 351,798,960 worth of Carlsberg shares back to D.D.C. Cayman in a closed loop circular fashion.  Neither entity ever held actual Carlsberg shares or went into the market to acquire any shares.



**Figure 15 – The Bernina Plan Solo Trade**

172.    Solo Capital later unwound the transaction by purportedly selling the Carlsberg shares it held and closing out the loan agreement.

173.    In the end, there was no movement of cash or delivery of securities.  The purported transactions were simply reversed, leaving only a paper trail to support the reclaim application.  I have seen no evidence that any of the parties to this transaction loop ever

---

[223] ELYSIUM-01487961.