# Exhibit 44

| From: | John H. van Merkensteijn, III <jhvm@argremgt.com> on behalf of John H. van Merkensteijn, III <jhvm@argremgt.com> |
|---|---|
| To: | Stephanie Furr; Stephanie Furr |
| Sent: | 8/4/2015 8:15:08 PM |
| Subject: | Fwd: Federal Reserve Inquiry |
| Attachments: | 0580_001.pdf; 0581_001.pdf; ATT00001.htm; ATT00002.htm |



PETER WELLS

EXHIBIT 3125

05 - 27 - 2021

Print

John H. Van Merkensteijn lll
Managing Director
Argre Management LLC
60 Riverside Boulevard
Suite 2101
New York, NY. 10069
Phone (212) 769-4055
jhvm@argremgt.com

Begin forwarded message:

**From:** "Wells, Peter" <Peter.Wells@kayescholer.com>
**To:** "Richard Markowitz" <rmarkowitz@argremgt.com>, "John H. van Merkensteijn, III" <jhvm@argremgt.com>
**Subject: FW: Federal Reserve Inquiry**

All,

The Federal Reserve has come back from our last response and ask that we provide them with a relevant sample brokerage agreement between the plan (True Wind) and broker.  Of the three brokers that we indicated True Wind had used (Bastion, TJM and Sunrise) I have copies of the agreements for Bastion and TJM (I am not aware of any agreement with Sunrise). I note, however, that I do not have the fully countersigned Bastion agreement and, in any case, that agreement lists Old Park Lane as the clearing broker/custodian and True Wind is now using West Point Derivatives (which we disclosed previously to the Federal Reserve).

As such, it seems the TJM agreement is the best one to provide (informally, the contact at the Federal Reserve said it was fine to provide one agreement from any of the three that the plan used).

I have attached these two agreements to this email so you can see them.

Regards,
Peter

Peter Wells
Kaye Scholer LLP
250 West 55th Street | New York, New York 10019-9710
T: (212) 836-8662 | F: (212) 836-6447
peter.wells@kayescholer.com | www.kayescholer.com

Any U.S. federal tax advice contained in this message (including any attachments) may not be able to be used for purposes of avoiding tax-related penalties imposed under U.S. federal tax laws. This message may contain confidential and/or legally

privileged information from the law firm Kaye Scholer LLP. If delivered to anyone other than the intended recipient, please notify the sender immediately by return email or by telephone (212) 836-8662 and delete the message, along with any attachments, from your computer. Thank you.

---

**From:** Matthew Stein [mailto:mstein@maplept.com]
**Sent:** Saturday, June 27, 2015 7:30 AM
**To:** Jérôme LHOTE
**Cc:** Ben-Jacob, Michael; Wells, Peter; Richard Markowitz; John H. van Merkensteijn, III; Adam Larosa
**Subject:** Re: Federal Reserve Inquiry

Ok

On Jun 27, 2015, at 12:46 PM, Jérôme LHOTE <jlhote@maplept.com> wrote:

Ok

Jérôme LHOTE
Maple Point LLC

40 West 57 Street
Suite 1610
New York, NY 10019
T: +1 212 247 2600
C: +1 917 640 9365
E: jlhote@maplept.com

On Jun 26, 2015, at 17:54, Ben-Jacob, Michael <Michael.Ben-Jacob@kayescholer.com> wrote:

All,

I have considered the various email exchanges and Peter's updated draft below.  I think it works well.  Please confirm that we may send it.

Regards.

mbj

Michael Ben-Jacob
Kaye Scholer LLP
250 West 55th Street | New York, New York 10019-9710
T: +1 212.836.8310 | F: +1 212.836.6310
michael.ben-jacob@kayescholer.com | www.kayescholer.com

---

**From:** Wells, Peter
**Sent:** Friday, June 26, 2015 4:46 PM
**To:** 'Richard Markowitz'
**Cc:** Jérôme LHOTE; John H. van Merkensteijn, III; Ben-Jacob, Michael; Matthew Stein; Adam Larosa
**Subject:** RE: Federal Reserve Inquiry

So taking out the "co-investment" part the proposed responses would be as follows:

- · With respect to the coordination and co-investment activities by the plans, how do the plans know one another such that they decide to make these co-investments?

  - Ø The beneficial owners and trustees of the various plans for which we report have long standing common personal and professional relationships.  It is through these relationships that the plans have come to know

one another and, as a result, decided to implement similar trading strategies that result in the reportable monthly transactions.

· To the extent that strategies are recommended by some other party (e.g., Solo) is there any document that can be provided which more clearly explains their role vis-à-vis the plan?

Ø There is no particular document which more specifically details the role that any non-U.S. regulated entity provides with respect to any recommendation as to particular trading strategies.

Peter Wells
Kaye Scholer LLP
250 West 55th Street | New York, New York 10019-9710
T: (212) 836-8662 | F: (212) 836-6447
peter.wells@kayescholer.com | www.kayescholer.com

Any U.S. federal tax advice contained in this message (including any attachments) may not be able to be used for purposes of avoiding tax-related penalties imposed under U.S. federal tax laws. This message may contain confidential and/or legally privileged information from the law firm Kaye Scholer LLP. If delivered to anyone other than the intended recipient, please notify the sender immediately by return email or by telephone (212) 836-8662 and delete the message, along with any attachments, from your computer. Thank you.

**From:** Richard Markowitz [mailto:rmarkowitz@argremgt.com]
**Sent:** Friday, June 26, 2015 12:32 PM
**To:** Wells, Peter
**Cc:** Jérôme LHOTE; John H. van Merkensteijn, III; Ben-Jacob, Michael; Matthew Stein; Adam Larosa
**Subject:** Re: Federal Reserve Inquiry

I agree with John suggestion of just limiting it to "implement similar..."

Your other answers are fine with me.

On Jerome's email, we should not send any custody documents unless they happen to be the specific ones the plans they have inquired about have entered into, especially if some of the plans don't have any relationship with Solo.

Richard Markowitz
Mobile: (917) 848-5675
Office:  (212) 231-3923

On Jun 26, 2015, at 11:01 AM, Wells, Peter <Peter.Wells@kayescholer.com> wrote:

I was just typing up the email to the group.

Our proposed answer to the questions are as follows:

· With respect to the coordination and co-investment activities by the plans, how do the plans know one another such that they decide to make these co-investments?

Ø The beneficial owners and trustees of the various plans for which we report have long standing common personal and professional relationships.  It is through these relationships that the plans have come to know one another and, as a result, decided to co-invest with one another and to implement similar trading strategies that result in the reportable monthly transactions.

· To the extent that strategies are recommended by some other party (e.g., Solo) is there any document that can be provided which more clearly explains their role vis-à-vis the plan?

Ø There is no particular document which more specifically details the role that any non-U.S. regulated entity

provides with respect to any recommendation as to particular trading strategies.

Let us know if you have any additional thoughts or additions to our proposed responses.
Regards,
Peter


Peter Wells
Kaye Scholer LLP
250 West 55th Street | New York, New York 10019-9710
T: (212) 836-8662 | F: (212) 836-6447
peter.wells@kayescholer.com | www.kayescholer.com

Any U.S. federal tax advice contained in this message (including any attachments) may not be able to be used for purposes
of avoiding tax-related penalties imposed under U.S. federal tax laws. This message may contain confidential and/or legally
privileged information from the law firm Kaye Scholer LLP. If delivered to anyone other than the intended recipient, please
notify the sender immediately by return email or by telephone (212) 836-8662 and delete the message, along with any
attachments, from your computer. Thank you.

**From:** Jérôme LHOTE [mailto:jlhote@maplept.com]
**Sent:** Friday, June 26, 2015 11:00 AM
**To:** John H. van Merkensteijn, III
**Cc:** Ben-Jacob, Michael; Richard Markowitz; Wells, Peter; Matthew Stein; Adam Larosa
**Subject:** Re: Federal Reserve Inquiry

Dear All,

What do we want to do there. I understood that KS would prepare a proposed answer for our review.
I had discussed with Peter whether it made sense to simply explain that there is no RIA relationship in the U.S.
or anywhere else. We could send the custody agreement that exists with Solo as a sample of the agreement in
place as well if we want to be proactive the agreements I place with some of the non US brokers.
Let me know how you want to proceed. I do not believe we want to wait to long to address the question even if it
was just orally to KS.

Jerome

Sent from my iPad

On Jun 18, 2015, at 7:59 PM, John H. van Merkensteijn, III <jhvm@argremgt.com> wrote:

They didn't ask us to provide anything new, just to say of we had anything in writing?

They have a website, maybe we should point them to that?

John H. van Merkensteijn, III
Managing Director
Rossi Acquisitions LLC
60 Riverside Boulevard
Suite 2101
New York, N.Y. 10069
Phone 212.769.4055
Fax: 212.247.2753
Cell: 917.865.3595
jhvm@rossacq.com

**From:** Michael Ben-Jacob <michael.ben-jacob@kayescholer.com>
**Date:** Thursday, June 18, 2015 at 7:46 PM
**To:** Richard Markowitz <rmarkowitz@argremgt.com>, Peter Wells <Peter.Wells@kayescholer.com>
**Cc:** Matthew Stein <mstein@maplept.com>, Jerome Lhote - City <jlhote@maplept.com>, John van Merkensteijn <jhvm@argremgt.com>, Adam Larosa <alarosa@argremgt.com>
**Subject:** RE: Federal Reserve Inquiry

Rich,

On question 1, we were contemplating something along the lines of a letter from Solo explaining the general services they provide for clients and indicating that those are the services they are providing here.  Is this something you would be opposed to?

mbj


Michael Ben-Jacob
Kaye Scholer LLP
250 West 55th Street | New York, New York 10019-9710
T: (212) 836-8310 | F: (212) 836-6310
michael.ben-jacob@kayescholer.com | www.kayescholer.com

Any U.S. federal tax advice contained in this message (including any attachments) may not be able to be used for purposes of avoiding tax-related penalties imposed under U.S. federal tax laws. This message may contain confidential and/or legally privileged information from the law firm Kaye Scholer LLP. If delivered to anyone other than the intended recipient, please notify the sender immediately by return email or by telephone (212) 836-8310 and delete the message, along with any attachments, from your computer. Thank you.

**From:** Richard Markowitz [mailto:rmarkowitz@argremgt.com]
**Sent:** Thursday, June 18, 2015 6:19 PM
**To:** Wells, Peter
**Cc:** Matthew Stein; Jérôme LHOTE; John H. van Merkensteijn, III; Ben-Jacob, Michael; Adam Larosa
**Subject:** Re: Federal Reserve Inquiry

On question 1, we don't have anything in writing and I don't think we want to have a document created.

Richard Markowitz
1345 Avenue of the Americas
27th Floor
New York, NY 10105

Rmarkowitz@Argremgt.com
Mobile:  (917) 848-5675
Office:   (212) 231-3923

On Jun 18, 2015, at 5:28 PM, Wells, Peter <Peter.Wells@kayescholer.com> wrote:

All,

The Federal Reserve has come back with two additional follow-up questions (delivered over the phone and not in writing) as follows:

1.  To the extent that strategies are recommended by some other party (e.g., Solo) is there any document that can be provided which more clearly explains their role vis-à-vis the plan?

    ·    Michael and I weren't sure what, if anything, we could provide here that would be in writing, but we open it up to the group to see if there are any thoughts on whether any such document exists or can be created.

2.  With respect to the coordination and co-investment activities by the plans, how do the plans know one another

such that they decide to make these co-investments?

·     We can craft an answer to this question which addresses that the plans are similarly situated insofar as the beneficial owners of the plan know one another professionally etc.

While not explicitly stated, the basic thrust of the brief conversation seemed that in the absence of a U.S. investment advisor who is bringing the parties together and coordinating the investment activities they want to better understand how the investments are so similar across all of the reporting entities.

Regards,
Peter

Peter Wells
Kaye Scholer LLP
250 West 55th Street | New York, New York 10019-9710
T: (212) 836-8662 | F: (212) 836-6447
peter.wells@kayescholer.com | www.kayescholer.com

Any U.S. federal tax advice contained in this message (including any attachments) may not be able to be used for purposes of avoiding tax-related penalties imposed under U.S. federal tax laws. This message may contain confidential and/or legally privileged information from the law firm Kaye Scholer LLP. If delivered to anyone other than the intended recipient, please notify the sender immediately by return email or by telephone (212) 836-8662 and delete the message, along with any attachments, from your computer. Thank you.

**From:** Matthew Stein [mailto:mstein@maplept.com]
**Sent:** Tuesday, June 09, 2015 7:32 AM
**To:** Wells, Peter
**Cc:** Jérôme LHOTE; John H. van Merkensteijn, III; Richard Markowitz; Ben-Jacob, Michael
**Subject:** Re: Federal Reserve Inquiry

Ok

On Jun 8, 2015, at 5:42 PM, Wells, Peter <Peter.Wells@kayescholer.com> wrote:

All,

Further to our recent call on the subject, below are our revised proposed responses to the Federal Reserve:

**Trustees:**

·     Please review and confirm if U.S. Sub-Brokers were involved in the reportable monthly transactions.

Ø I confirm that there were no U.S. Sub-Brokers involved in the reportable monthly transactions.

·     Please provide the name of the Investment manager/advisor that is responsible for making investment decisions on behalf of the pension plan.

Ø There is no U.S. investment manager or advisor responsible for making investment decisions. The trustee has sole legal authority to make investment decisions.

·     What role does Broad Financial have in the pension plan?

Ø Broad Financial is the service provider that assisted with the documents necessary for the legal formation of the plan.

·     Is the pension plan using a U.S. bank or a U.S. custodian?

Ø No, the plan is not using a U.S. bank or a U.S. custodian with respect to the reportable monthly transactions.

·     Please provide the registered ID number for the pension plan.

Ø The pension plans are not incorporated entities and therefore do not have any registered ID number.

**CONFIDENTIAL**        **PRIVILEGED - SUBJECT TO 502(d) ORDER**     **GUNDERSON 00009820**

**Kaye Scholer:**

Below please find our follow up questions regarding the reporting of these five pension plans.

· The trust documents do not provide the place of incorporation for these pension plans. Can you please provide the incorporation document for the five selected plans?

   Ø The plans themselves (and the related trust documents) are not incorporated entities and therefore do not have places of incorporation. The plan formation documents have previously been provided. The trusts and plans are governed by the laws of the following jurisdictions:

      o Fairview Post Pension Plan – Delaware

      o Jewelry Creations Pension Plan – Minnesota

      o Babine Pension Plan – Delaware

      o Ternuay Investments Pension Plan – Delaware

      o True Wind Investments LLC Roth 401(k) Plan – New York

· Please provide a document that clarifies the roles of all the involved parties for the pension plans (i.e. custodian, broker, investment manager/advisor, trustee, fund administrator, etc.).

   · The plans are qualified retirement plans established by the sponsoring employer to facilitate the retirement savings of the plan beneficiaries. The plan assets are held and administered by the designated trustee. While the trust and plan documents permit the appointment of an investment manager, no such manager has been appointed. As a result, the trustee has sole legal authority to make investment decisions on behalf of the plan. With respect to any of the other parties referenced above (e.g., brokers, custodians etc.) any such relationships are arm's length and entered into in the normal course of the plan's investment activities.

· As you had mentioned on our call, please clarify in detail how these pension plans are affiliated with each other.

   Ø These plans are not affiliated with one another in anyway. There are other reporting plans that are affiliated in that they have the same beneficial owner. In addition, certain combinations of the plans co-invest with others to implement the same or similar trading strategies, which strategies are recommended by certain non-U.S. regulated entities such as Solo Capital Partners LLP, which is regulated in the UK by the FSA.

· Please explain the role of Broad Financial for the pension plans?

   Ø Broad Financial is the service provider that assisted with the documents necessary for the legal formation of the pension plans.

· Please provide the registered ID number for the five pension plans.

   Ø The pension plans are not incorporated entities and therefore do not have any registered ID number.

· Several of the pension plans are using the same Foreign Broker and purchasing the same securities on the same exchanges. Please review and confirm if the transactions were executed by an investment manager/advisor on behalf of the pension plans.

   Ø We confirm that there is no U.S. investment manager/advisor acting on behalf of the pension plans.

Peter Wells
Kaye Scholer LLP
250 West 55th Street | New York, New York 10019-9710
T: (212) 836-8662 | F: (212) 836-6447
peter.wells@kayescholer.com | www.kayescholer.com

**CONFIDENTIAL**          **PRIVILEGED - SUBJECT TO 502(d) ORDER**    **GUNDERSON 00009821**

Any U.S. federal tax advice contained in this message (including any attachments) may not be able to be used for purposes of avoiding tax-related penalties imposed under U.S. federal tax laws. This message may contain confidential and/or legally privileged information from the law firm Kaye Scholer LLP. If delivered to anyone other than the intended recipient, please notify the sender immediately by return email or by telephone (212) 836-8662 and delete the message, along with any attachments, from your computer. Thank you.

On Jun 3, 2015, at 8:18 AM, Wells, Peter <Peter.Wells@kayescholer.com> wrote:

All,

Further to our various conversations over the last few days, below are the additional questions from the Federal Reserve.  As noted, the top set are the questions sent directly to the trustee and the bottom set are the questions sent directly to us.  We have provided some preliminary draft responses, subject to discussion.  In addition, we also noted where we needed to go back to the Federal Reserve for some clarification as their questions were not entirely clear to us. We are waiting for them to get back to us on those points.

We have sent this email to the broader group so that we have consistency in the answers.

We think it makes sense to set up a conference call for those that want to discuss.  Today is very tight for our schedule so we would like to propose some times on Thursday for the call. We propose 11:00AM tomorrow – assuming that generally works.

Please you the below dial-in:

      U.S. - 1-877-789-5293

      International - 1-719-359-8930

      Code: 212 836 8662


Regards,
Peter


**Questions to Trustees:**

·     Please review and confirm if U.S. Sub-Brokers were involved in the reportable monthly transactions.

    Ø I confirm that there were no U.S. Sub-Brokers involved in the transactions.

·     Please provide the name of the Investment manager/advisor that is responsible for making investment decisionson behalf of the pension plan.

    Ø There is no U.S. investment manager or advisor responsible for making investment decisions.  The trustee has sole legal authority to make investment decisions.

·     What role does Broad Financial have in the pension plan?

    Ø Broad Financial is the service provider that assisted with the documents necessary for the legal formation of the plan.

·     Is the pension plan using a U.S. bank or a U.S. custodian?

    Ø No, the plan is not using a U.S. bank or a U.S. custodian with respect to the reportable monthly transactions.

·     Please provide the registered ID number for the pension plan.

    Ø [Following-up with the Federal Reserve on this point.]

**Kaye Scholer:**

The trust documents do not provide the place of incorporation for these pension plans. Can you please provide the incorporation document for the five selected plans?

Ø The plans themselves (and the related trust documents) are not incorporated entities and therefore do not have places of incorporation. The trusts and plans are governed by the laws of the following jurisdictions (to the extent not otherwise governed by Federal law):

   o Fairview Post Pension Plan – Delaware

   o Jewelry Creations Pension Plan – Minnesota

   o Babine Pension Plan – Delaware

   o Ternuay Investments Pension Plan – Delaware

   o True Wind Investments LLC Roth 401(k) Plan – New York

· Please provide a document that clarifies the roles of all the involved parties for the pension plans (i.e. custodian, broker, investment manager/advisor, trustee, fund administrator, etc.).

Ø [Following-up with the Federal Reserve on this point]

· As you had mentioned on our call, please clarify in detail how these pension plans are affiliated with each other.

Ø These plans are not affiliated with one another in any way. There are other reporting plans that are affiliated in that they have the same beneficial owner. In addition, certain combinations of the plans co-invest with others to implement the same or similar trading strategies, which strategies are recommended by certain non-U.S. regulated entities such as [_____], which is regulated in the UK by the FSA.

· Please explain the role of Broad Financial for the pension plans?

Ø Broad Financial is the service provider that assisted with the documents necessary for the legal formation of certain of the pension plans.

· Please provide the registered ID number for the five pension plans.

Ø [Following-up with the Federal Reserve on this point]

· Several of the pension plans are using the same Foreign Broker and purchasing the same securities on the same exchanges. Please review and confirm if the transactions were executed by an investment manager/advisor on behalf of the pension plans.

Ø We confirm that there is no U.S. investment manager/advisor acting on behalf of the pension plans.

**CONFIDENTIAL**           **PRIVILEGED - SUBJECT TO 502(d) ORDER**      **GUNDERSON 00009823**

True Wind Investments LLC Roth 401(K) Plan
Vcorp Services LLP
Wilmington
Deleware 19810
New Castle

30th January 2015

Dear Mr. Altbach,

Under the Markets in Financial Instruments Directive (MiFiD), we may treat you as an elective professional client if, after our assessment of your expertise, experience, and knowledge of you, we are reasonably assured that, in light of the nature of the transactions or services envisaged, you are capable of making your own investment decisions and understanding the risks involved. This is the "qualitative test".

In summary the qualitative test, aside from a reasonable degree of familiarity with investments, refers to clients that are happy to confirm that they:

a) Carried out transactions, in significant size, on the relevant market at an average frequency of 10 per quarter over the previous four quarters.

b) Have a financial portfolio where the total of all cash deposits and all financial products have a combined value of over EUR 500,000

c) Have, for at least a year, worked in a profession that required knowledge of financial products.

**Any 2 of the above 3 criteria will suffice.**

If you do not feel that two out of the three criteria apply to you, you should not agree to be treated as a professional client.

Please feel free to contact us on 0207 965 4620 if you have any question regarding your categorisation.

Yours sincerely,

**Timothy Jenkins**
**Managing Partner**

1

The TJM Partnership PLC is authorised and regulated by the Financial Conduct Authority | FCA No. 498199

Registered office: 30 Crown Place, London, EC2A 4EB, United Kingdom | Company Registration No.06803933

CONFIDENTIAL

GUNDERSON 00009824

**Professional Client Notice**

The main differences in regulatory protections afforded to retail clients vs. professional clients are:

Communications, including financial promotions made by us with professional clients are not subject to all of the requirements imposed by MiFID.

Information provisions about TJM, its services, and remuneration that are required with respect to retail clients are not all required with respect to professional clients

Professional clients are not eligible complainants with respect to the Financial Ombudsman Services ("FOS") and do not have access to this service.

Pre-requirements for the entry into written basic agreements for designated investment business may not apply to professional clients.

If TJM makes a personal recommendation or manages investments professional client in the course of MiFID or equivalent third party business, it is entitled to assume that, in relation to the products, transactions and services for which the professional client is so classified, the client has the necessary level of experience and knowledge for the purposes of suitability assessment, and where the Firm is required to provide suitability reports to a retail client, in many cases the firm is not required to provide them to a professional client.

With respect to non-advised services, TJM is not required to request information or adhere to the same procedures when assessing the appropriateness of a given service or product for a professional client, and TJM may not be required to give warnings to the professional client if the TJM cannot determine appropriateness with respect to a given services or product.

TJM must provide certain product information to retail clients, but not professional clients, when selling packaged products, cash ISAs, or cash Child Trust Funds. There is no right to cancel a non-distance contract to buy a unit in a regulated collective investment scheme if the consumer is not a retail client.

When managing investments for a client, a firm must provide the client with a periodic statement. For retail clients, the content of the statement is prescribed, but for professional clients, it is not.

2

The TJM Partnership PLC is authorised and regulated by the Financial Conduct Authority | FCA No. 498199

Registered office: 30 Crown Place, London, EC2A 4EB, United Kingdom | Company Registration No.06803933

CONFIDENTIAL                                                                                   GUNDERSON 00009825

TJM may take into consideration the classification of the client in following its Order Execution Policy, as well as in providing information, including product information, to clients.

Finally, it is up to you to keep TJM informed of any change that could effect your categorisation.

Signing the declaration at the end of this form will signify your consent to this categorisation.

**CLIENT DECLARATION AND WARRANTIES**:

I warrant that I satisfy at least two of the three criteria listed above.

Furthermore, I confirm that I wish to be treated as a professional client generally by the TJM Partnership PLC (hereafter TJM). I have read and understood the written warning above from TJM regarding the protections and compensation rights that I may lose, and I am aware of the consequences of losing such protections:

I wish to be treated as a Professional Client in respect of (complete and initial where applicable);

1. All Services / Transactions      (Initial)................................
2. Specific Services /Transactions    (Equity trades)......................
                                               ....................................
                                               ....................................
                                               ....................................
                                               (Initial)..........................

I confirm that it is my responsibility to keep the Firm informed of any change that could affect your consent to this categorisation;

Signed by Client            Michael Ben-Jacob, Attorney-in-fact (Feb 21, 2015)

Dated                      ........................................

3

The TJM Partnership PLC is authorised and regulated by the Financial Conduct Authority | FCA No. 498199

Registered office: 30 Crown Place, London, EC2A 4EB, United Kingdom | Company Registration No.06803933

**CONFIDENTIAL**            **GUNDERSON 00009826**

RISK WARNING

You should be aware that the price of shares and other investments, and the income derived from them, may fall as well as rise and the amount realised may be less than the original sum invested. Some securities carry a greater risk than others. It is our policy to fully advise you of the risks associated with the investments that we will arrange and manage for you.

Shares, Fixed Interest Bonds and Gilts, and Collective Investments are all classified as Non Complex Products, however like all investment products, carry a certain degree of risk.

i.    Shares – There is an extra risk when buying shares in smaller capitalised companies or unlisted shares. Due to a larger difference between the buying price and selling price of these shares, if they had to be sold immediately you may get back far less than you paid for them. Emerging Market Shares often have less liquidity than shares in more developed markets and may not be regulated as strictly. Investing in shares in a specialist sector is considered to be a higher risk strategy due to the lack of diversification and greater exposure to higher volatility.

ii.    Fixed Interest Bonds & Gilts classified BBB- or above by recognised rating agencies are generally considered to be a safe investment, with AAA rated bonds considered the safest, however sub investment or junk bonds, which often payer higher rates of interest, are issued by companies that are less financially secure and therefore the risk of default is substantially higher.

iii.    Collective Investments – These include Investment Trusts, Unit Trusts, Exchange Traded Funds (ETFs) and Real Estate Investment Trusts (REITs). When considering investing into any of the above products it is highly recommended that you read the key features document prior to making any decision and if necessary consult with a professional investment adviser. The value of an investment into a Collective Investment can fall as well as rise and you may not get back your original investment.

Complex Products – Futures, Options and Warrants are all classified as Complex Products and prior to dealing in these products, you should be aware of the nature and level of risk associated. You must understand that although it is not uncommon for these products to be used for the management of investment risk some of these products are not suitable for all investors. We therefore advise that you speak to your Independent Financial adviser if necessary. Before TJ Markets will enter you into any transaction involving a Complex Product we will need to be satisfied that the product is suitable for you with regards to your financial circumstances and product knowledge and investment time horizon.

i.    Futures – Transactions in Futures involve the obligation to make, or take, delivery of the underlying asset of the contract at a future date, or in some instances to settle the position with cash. Futures are considered a high risk financial instrument. The gearing or leverage often obtainable means that a small deposit can lead to large losses (as well as gains). It also means that a relatively small movement can lead to a much larger movement in the value of your investment. Futures transaction have a contingent liability, and you should be aware of the implications of this, in particular the margining requirements.

ii.    Options – There are many different types of options with different characteristics.

iii.    Buying Options – Buying Options involves less risk then selling because the maximum loss is limited to the premium, plus any dealing costs.

iv.    Writing Options – Has considerably far greater risks than buying options. You may be liable for margin to maintain your position and a loss may be sustained well in excess of the premium received. By writing an Option you accept a legal obligation to purchase or sell the underlying assets if the option is exercised against you however far the market price has moved away from the exercise price.

v.    Warrants - A Warrant is a time-limited right to subscribe for shares, debentures, loan stock or government securities and is exercisable against the original issuer of the underlying securities. A relatively small movement in the price of the underlying security results in a disproportionately large movement, unfavourable of favourable, in the price of the warrant. It is essential for anyone who is considering purchasing warrants to understand the right to subscribe which a warrant confers is invariable limited in time with the consequence that if the investor fails to exercise this right within the predetermined time-scale then then investment becomes worthless.

GUNDERSON 00009827

vi.   Derivatives – Derivatives are financial instruments, the values of which are derived from an underlying asset's value. Rather than trade or exchange the asset itself, an agreement is entered into to exchange money, assets or some other value at some future date based on the underlying asset. Investing in derivatives should be made with caution, especially for less experienced investors, or investors with a limited amount of capital to invest.

vii.   Contract For Differences (CFDs) – Certain derivatives are referred to as contracts for differences. These can be options and futures on the FTSE 100 index or any other index of an exchange, as well as equity, currency and interest rate swaps, amongst others. CFDs are only settled in cash and carry a high degree of risk. Like a Futures product, the gearing or leverage often obtainable means that a small deposit can lead to large losses (as well as gains). It also means that a relatively small movement can lead to a much larger movement in the value of your investment. CFD transactions have a contingent liability, and you should be aware of the implications of this, in particular the margining requirements. CFDs can be used for speculative purposes or as hedges to manage other investment risk. In all cases the suitability of the transaction for the particular investor should be very carefully considered.

Declaration

I have read this form and to the best of my knowledge the information that I have provided is correct. I undertake to notify The T J M Partnership PLC of any significant/material changes. I understand that the above information needs to be reviewed regularly.

Client Name :

True Wind Investments LLC Roth 401(K) Plan

Date DD/MM/YYYY :

21/2/2015

Michael Ben-Jacob, Attorney-in-fact (Feb 21, 2015)

The TJM Partnership PLC is authorised and regulated by the Financial Conduct Authority | FCA No. 498199

Registered office: 30 Crown Place, London, EC2A 4EB, United Kingdom | Company Registration No.06803933

GUNDERSON 00009828

**Terms of Business**

**Professional Clients**

1. **Interpretation**
These Terms and Conditions of Business shall apply to all and any investment business, as that term is defined under FSMA within the scope of Clause 4, undertaken with you or on your behalf by TJM.

The following terms shall have the following meanings:
i) **Agreement** means these Terms of Business;
ii) **Client Information Record** means the documents which record all your investment objectives and level or risk to be assumed by you;
iii) **Crest** means the organisation responsible for the paperless registration, transfer and settlement of transferable securities;
iv) **Execution Only** means transactions where we act on your instructions and offer no advice as to whether such an investment is suitable for you;
v) **FCA** means the Financial Conduct Authority or any successor body thereto;
vi) **FSMA** means the Financial Services Markets Act 2000;
vii) **Professional Client** has the same definition as under the FCA rules, namely a client who is either per se a professional client or an elective professional client;
viii) **Rules/Applicable Regulations** mean the rules, statutory regulations, customs and practices from time to time of any exchange, clearing house or other organisation or market involved in the execution or settlement of a transaction or contract.
ix) **TJM** means The TJM Partnership PLC, the details of which are set out at Clause 3 (Our Particulars);

x) **Terms** means the terms of business set out in this Agreement and any Annexures hereto.
xi) **UK** means the United Kingdom of Great Britain.

2. **Commencement of Terms of Business**
i) Please confirm that you agree to the terms and conditions set out below by either clicking "I agree to these Terms and Conditions" when submitting the online application form or by signing, dating and returning this document (in the original) to us. This will form a record of your agreement and acceptance of these Terms.
ii) These Terms shall commence on [the day TJM receives this duly accepted document either by online submission or by post.
iii) There is no minimum term to this Agreement which shall remain in force until terminated in accordance with the provisions of Clause 21 (Termination).
v) These Terms and all contracts undertaken in accordance with them shall be subject to the provisions of any term sheet offered to you or other agreement entered into between us, and:
(a) all UK laws and any successor legislation, including without limitation, the Rules;
(b) rules, statements of principle and directives of applicable authorities (including self-regulating organisations) responsible for the regulation of investment business;
(c) all statutory and other requirements relating to money laundering, including, without limitation, The Terrorism Act 2000 (as amended by the Anti-terrorism, Crime and Security Act 2001), The Money Laundering Regulations 2007 and The Proceeds of Crime Act 2002 and any successor

legislation;

(d) all rules, regulations and by-laws of any relevant exchange and/or clearing institution; and

(e) all applicable accepted market practice and custom;

In the event of any conflict between these Terms and any other document, these Terms shall prevail.

### 3. Our Particulars

i) TJM is authorised and regulated by the FCA in the conduct of investment business in the United Kingdom, (FCA No 498199).

ii) Our office and postal address is 30 Crown Place, London, EC2A 4EB. Our telephone number is +44(0)20 7965 4620. Our website address is www.tjmpartners.com and the email address to which you can send enquiries is mail@tjmpartners.com

### 4. Services

i) Your account will be introduced to an executing broker/clearer and will be subject to a completed Power of Attorney in favour of TJM being in place. You will contract with the executing broker/clearer as principal and will be subject to their terms and conditions. The executing broker/clearer will be clearly identified during the application process.

ii) TJM may advise on and arrange transactions in investments and make arrangements with a view to transactions on your behalf in the following investments and instruments:

(a) securities, including shares, warrants and certificates representing securities; and any derivatives thereof including contracts for differences; and

(b) such other investments as TJM may from time to time agree in writing. The services may

involve contracts in investments, which are:

a. traded on exchanges which are not recognised investment exchanges or designated investment exchanges (as those terms are defined in the Rules); and/or

b. not traded on any stock or investment exchange; and/or

c. non-readily realisable investments (as defined in the Rules)

iii) TJM reserves the right to refuse to open an account. There may also be regulatory constraints on us being able to offer our services outside of the UK. You are required to advise us if you reside outside the UK, or if you relocate outside of the UK after you have entered into an Agreement with us.

### 5. Our Charges/Fees

i) TJM's charges shall be as agreed or notified to you at its prevailing rates as may be amended from time to time. If we do amend our charges we will notify you at least 30 (thirty) days in advance of doing so.

ii) You will pay any value added tax and such other taxes, duties and fees as are applicable.

iii) Any charges due to us plus any applicable taxes, duties or fees shall be paid by you to us as stated in our agreement.

iv) If you require a share certificate or request that your CREST holding be transferred, a fee will be charged.

### 6. Client Classification

i) We will treat you as a Professional Client.

ii) Subject to your right to request a different status as referred to below, we shall treat you in

GUNDERSON 00009830

accordance with such classification for all purposes.

iii) A summary of the main differences between the treatment of Professional and Retail Clients is set out at Annexure B. Please read this carefully and take independent legal advice if you are unclear as to your client classification.

iv) As a Professional client, you agree to notify us immediately if you consider that you no longer fall into the definition of a Professional client.

v) As a Professional client, you have the right to request re-categorisation as a Retail Client in order to benefit from a higher degree of regulatory protection.

## 7. Investment Objectives and Risk

i) For non-execution accounts only and unless otherwise notified in writing, we will assume that your investment objectives and the level of risk that you are prepared to assume are as set out by you in the Client Information Record. If any of these circumstances change, you should inform us immediately.

ii) For non-execution accounts: if you instruct us to carry out an **Execution Only** transaction, we will not advise you about the merits of the transaction at the time of execution or on an ongoing basis. We will not be required to ensure that the transaction is suitable or appropriate for you and nor will we be held liable for its future performance. You will be informed of this in the course of our dealings with you.

iii) As a Professional Client we are entitled to assume that you have the requisite knowledge and experience in the relevant investment field. We are also entitled to assume that you are able to financially bear any related

investment risks consistent with your investment objectives. If you do not consider this to be the case you must make us aware of this prior to the provision of any services to you and you should supply us with any available information as to the level of your knowledge and experience and/or your financial position.

v) TJM will disclose any risk warnings as required and in this regard please see our statement regarding risk annexed hereto at Annexure A. However, it is your sole responsibility to ensure that investments effected are in accordance with your investment objectives and comply in all respects with any applicable legal or regulatory restrictions upon you entering into such contracts.

## 8. Execution Arrangements Only

We will not advise you of the suitability or merits of a particular transaction if we reasonably believe that when you gave the instruction for that transaction to be carried out you are not expecting such advice and are therefore dealing on an Execution Only basis.

## 9. Instructions

(i) TJM may act on any instruction which it reasonably believes to have been given on your behalf and shall be under no duty to confirm such instruction. TJM may assume that any person purporting to give instructions on your behalf is properly authorised, without limitation to do so.

(ii) In the event that TJM provides advice to you, it shall not be required to ensure that such advice takes into account any research or other recommendations as may be published by TJM from time to time, nor of any information known to other areas within TJM

**GUNDERSON 00009831**

but not known to the TJM office dealing directly with you. TJM shall not be obliged to provide you with copies of any such publication either at the same time as it is provided to third parties or at all. TJM may, subject to the Rules, effect own account transactions in investments, which are or have been the subject of such advice and/or publications, or any related investments. No research shall constitute an offer by TJM to buy or sell any investment. You should read and consider carefully any disclosures or disclaimers, which appear in published research.

(iii) TJM shall not be liable for any loss, expense, cost or liability (including consequential loss) suffered or incurred by you as a result of instructions being given, or any other communications being made via the internet or other electronic media. You will be solely responsible for all orders, and for the accuracy of all information, sent via such electronic media using your name or personal identification number. TJM shall not be held responsible for delays or inaccuracies in the transmission of any instruction or other information or the execution of orders due to any cause whatsoever beyond the reasonable control of TJM.

(iv) You shall indemnify and keep TJM indemnified against all losses which TJM may suffer as a result of:

(a) any error in any instruction given by you; or

(b) acting on any instruction which is, or which appears to TJM acting reasonably, to be, from you.

(vi) In the event that TJM provides advice to you and, if after instructions are received, TJM reasonably believes that it is not in your best interests to act upon

such instructions, TJM may defer acting upon those instructions until it is practicable to do so or notify you that TJM is refusing to act upon such instructions. TJM shall not be liable for any losses resulting from such deferral or refusal.

(vii) TJM may (but shall not in any circumstances be obliged to) require confirmation (in such form as TJM may request) of any instruction:

(a) which is given orally;

(b) if it appears to TJM that such confirmation is necessary or desirable; or

(c) if such instruction is to remit money due to you.

## 10. Contracts not on Regulated Markets

TJM may advise or arrange transactions in circumstances where the relevant transaction is not governed by the rules of an investment exchange or is executed on an exchange that has not been recognised or designated under the Rules. In this event, you may be required to enter into additional documentation in order to effect any such transactions with the assistance of TJM.

## 11. Safe Custody of Client Assets

(i) All clients' assets are held securely with our designated custodians, prime brokers or other regulated counterparties.

(ii) As a professional client you are entitled to request that your assets be segregated, but unless you specifically request this, our custodians, prime brokers and regulated counterparties will pool your assets in accordance with the rules of the FCA.

(iii) The FCA has strict rules covering the conduct of firms authorised to hold and control clients' assets and the firms to which we will

introduce you will be subject to the prevailing rules and the following considerations:

(a) FCA firms authorised to hold and control clients' assets are required to carry out daily Financial Resource calculations to ensure the firm has adequate regulatory capital at all times;

(b) If your funds are segregated this will involve the firm placing client funds in a client money account separate from the firm's own money. In the event of default by the firm, segregated funds are held for our clients and debts of the firm cannot be paid with those funds. Similarly, should the firm's bank account become overdrawn, the bank cannot use client funds to reduce the overdraft. **Note:** segregation of client money from the firm's money does not protect the client if the bank that holds the client money bank account goes into administration.

(c) By the end of each business day the firm must rebalance their segregated funds accounts to ensure that the liquidation value of each client's account, as at midnight that day, is fully segregated.

(d) Where your assets are pooled your individual entitlements may not be identifiable by separate title documents or electronic records. In the event of an irreconcilable shortfall following any default your full entitlement may share in the shortfall pro-rata to your original share of the assets in the pool.

(e) Protections mentioned above may not apply if your assets are pooled as described.

12. **Execution**

i) In executing transactions for you, TJM will deal with you as an agent.

ii) In accordance with the FCA rules, TJM shall comply with our Best Execution policy. The effect of this is that when executing orders on your behalf, TJM will take all reasonable steps to achieve the best outcome for you, taking into account the nature of your order, the priorities you place upon us fulfilling those orders and the relevant market. We shall execute orders in accordance with our Order and Best Execution Policy a copy of which is available on our website homepage at www.tjmpartners.com.

13. **Recording of Conversations**

TJM may record telephone conversations on TJM telephone lines with or without the use of an automatic tone warning device. TJM may use such recordings and transcripts for any purpose that it deems desirable including use as evidence by TJM in any dispute between it and any other party. TJM is not required to maintain copies of such records and transcripts.

14. **Conflicts of Interest**

i) By accepting these Terms you agree that TJM may transact business where there may be a conflict of interest without prior reference to you.

ii) TJM or other persons connected with TJM may have an interest, relationship or arrangement that is material in relation to any transaction effected under these Terms.

iii) TJM may provide advice and other services to third parties whose interests may be in conflict or competition with your interests.

iv) TJM, other persons connected with TJM and the employees of any of them may take positions opposite to you or may be in competition

with you to acquire the same or a similar position.

v) Notwithstanding the above, TJM will not give unfair preference to itself or any other person over you and will take reasonable steps to ensure that you are not treated in terms materially less favourable than if the conflict or potential conflict had not existed and will not be responsible for any loss which may result from such competition.

### 15. Complaints

i) If you have any complaints against TJM then please contact our compliance director at the details set out in Clause 3 (Our Particulars) above. TJM will endeavour to resolve your complaint as quickly as possible but in any event, will send you a final response letter, which sets out the nature of that resolution and any applicable remedy within eight weeks.

ii) As a Professional Client, you will not be able to make a complaint to the Financial Ombudsman Service.

### 16. Compensation Scheme

Professional Clients might not be eligible to seek compensation under the Financial Services Compensation Scheme. For further information on eligibility you are able to refer to the FCA Handbook COMP 4.2 or the following link http://fshandbook.info/FS/html/handbook/COMP/4/2:

### 17. Indemnity and Limitation of Liability

(i) You shall indemnify TJM, its employees and agents and keep them indemnified in respect of any costs, claims, damages and expenses (present, future, contingent or otherwise and including reasonable legal fees) which arise as a result of or in connection with:

(a) any breach by you of these Terms; or

(b) TJM entering into any transaction under these Terms or otherwise performing its duties or acting on your instructions under these Terms and this indemnity shall survive termination of these Terms;

(ii) Neither TJM nor any third party (whether or not associated with TJM) shall be liable for any loss, expense, cost or liability (together "**Loss**") suffered or incurred by you unless such Loss is suffered or incurred as a result of TJM's willful default, gross negligence or fraud.

(iii) Nothing in these Terms shall oblige TJM to act in contravention of applicable laws, regulations, directions of authorities or regulators, market customs or practices. You accept that TJM is entitled to act in accordance with those applicable laws, regulations, directions, customs and practices and shall not be liable to you for the consequences of so doing.

### 18. Information

i) You irrevocably authorise TJM to disclose to the FCA, any government or other regulatory body or authority in any part of the world and to any connected person or third party, any information relating to you, including your positions, which is in its possession and which it is obliged or required to disclose or the disclosure of which may be necessary for the performance of TJM's obligations under these Terms, any additional agreement(s) or otherwise.

ii) TJM may provide information about you to any of its affiliates or third parties for the purposes of processing transactions, payments or settlements, or to any of its affiliates for marketing purposes or in connection with the provisions

**GUNDERSON 00009834**

of other services.

iii) You confirm that the provision by TJM to you of any services contemplated under these Terms may necessitate the processing by us of personal data in relation to your employees, including for the avoidance of doubt, the transmission of such personal data abroad both within and outside the European Union, and you confirm that you have procured the consent of each of your employees to such processing by TJM and will provide proof that such consent has been provided promptly if requested by us.

### 19. **Data Protection**
i) TJM is registered under the Data Protection Act 1998 (reference no. Z3406362). In accordance with legal and regulatory requirements, TJM will retain your records, for a minimum period of three years following the termination of this Agreement. This period may be extended by force of law, regulatory requirement or agreement between you and TJM.

ii) By entering into this Agreement you consent to our keeping information about you in written and electronic format. You have the right to review this information at any time.

iii) Upon written request, TJM will provide you with a copy of this data in accordance with section 7 of the Data Protection Act 1998, and upon payment of the statutory fee set out in our schedule of charges.

### 20. **Customer Warranties and Representations**
You warrant and represent (which shall be deemed to be repeated each time you provide instructions or information to TJM, that:
(i) you are not under any legal disability with respect to, and are

not subject to any law or regulation which prevents your performance of these Terms or any contract contemplated by these Terms;

(ii) you have obtained all necessary consents and have the authority to enter into these Terms (and if applicable, the company is properly empowered and has obtained necessary corporate or other authority pursuant to its constitutional and organisational documents);

(iii) investments or other property supplied by you shall at all times be free from any charge, lien, pledge or encumbrance;

(iv) you are in compliance with all laws to which you are subject including, without limitation, all tax laws and regulations, exchange control requirements and registration requirements; and

(iv) the information provided by you to TJM is complete, accurate and not misleading in any material respect.

### 21. **Termination**
i) Either party may terminate these Terms at any time by giving ninety (90) days written notice to the other.

ii) No penalty will be payable by either party on termination of these Terms.

iii) Termination will not affect any accrued rights. On termination, TJM shall complete all contracts that are already in progress and these Terms shall continue to bind both parties in relation to such contracts and it may require you to pay any charges reasonably incurred as a result of termination.

### 22. **Illegality**
If at any time any provision of these Terms is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the

    GUNDERSON 00009835

remaining provisions of these Terms under the law of that jurisdiction nor the legality, validity or enforceability of such provisions under the law of any other jurisdiction shall be in any way affected.

### 23. Force Majeure

TJM shall not be liable for any failure, delay or omission to perform any of its obligations or duties to you arising from any cause or causes beyond TJM's control, including without limitation, acts of God, acts or regulations of government or other authorities, restrictions on transfer or conversion, requisitions, involuntary transfers, war, fire, flood, explosions, civil commotion, strikes or other industrial disputes, power failure, failure of telecommunications lines, connection or equipment, any failure or defects in any hardware or software owned or supplied by third parties, or any failure of a broker, exchange or clearing house for any reason to perform its obligations.

### 24. Assignment and Sub-Contracting

i)  You may not transfer or assign any of your rights, or declare a trust of the benefit of your rights or delegate any of your obligations under these Terms of Business or any contract to any person.

ii) We reserve the right to assign, transfer, sub-contract, sell or otherwise dispose of the obligations, duties and/or benefits accruing to us under the basis of our relationship with you to any such party as we may consider from time to time.

### 25. General

(i) Except as provided above and otherwise as expressly provided herein, these Terms do not create any right under Contracts (Rights of Third Parties) Act 1999 which is enforceable by any person who is not a party to it other than affiliates of TJM or its directors, partners, officers, employees or agents.

(ii) As between TJM and its regulators, the Rules shall not be incorporated into these Terms of Business.

### 26. Amendment

TJM may amend these Terms at any time by giving notice to you, such notice to be served by sending you revised Terms or written notice of the amendments. Such amendments will become effective upon the date indicated in the notice. Such amendments shall have no impact upon any pre-existing rights or the obligations of the parties.

### 27. Notices

Any notice given under these Terms of Business may be personally served or sent by first class mail or email. A notice from TJM may be sent to your last known contact address. All notices to TJM should be sent to the Compliance Director at TJM.

### 28. Law and Jurisdiction

i)  These Terms are governed by and shall be construed in accordance with the laws of England and Wales.

ii) If you are not a company incorporated in England and Wales, you hereby irrevocably submit to the non-exclusive jurisdiction of the English courts and agree that any process, judgment or other document in relation to any action or proceeding arising out of these Terms or any transaction between TJM and you shall sufficiently be served if delivered to any place of business which you from time to time maintain in England and Wales.

iii) Any claim that such suit or proceeding brought in the courts of England and Wales has been

GUNDERSON 00009836

brought in an inconvenient forum is waived.

iv) To the extent that you may be entitled in any jurisdiction to claim immunity for yourself or your property or assets in respect of your obligations under these Terms from service of process, jurisdiction, suit, judgment, execution, attachment (whether before judgment in aid of execution or otherwise) or legal process to the extent that in any such jurisdiction there may be attributed to you or your property or assets such immunity (whether or not claimed), you hereby waive such immunity to the fullest extent permitted by the laws of such jurisdiction.

v) The rights and remedies of TJM and of the Customer under these Terms of Business are cumulative and do not (save as expressly provided in these Terms of Business) exclude any rights or remedies provided by law.

vi) No failure to exercise or delay in exercising the same shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any further or other exercise thereof.

## ANNEXURE A
## RISK WARNING NOTICE

TJM is authorised and regulated by the Financial Conduct Authority (FCA). It is our policy to provide all of our clients with the following risk warning notice in relation to dealing in margined products such as contracts for difference (CFDs), spread betting, futures and options. This document explains many of the risks associated with margined markets, but it cannot explain all of the risks.

As margined products carry a high level of risk, you should not deal in these products unless you understand their nature and the extent of your exposure to risk. You should also be satisfied that the product is suitable for you in the light of your circumstances and financial position and that you only speculate with funds you can afford to lose.

Although margined products can be utilised for the management of investment risk, it may not be suitable for some investors. In deciding whether to trade in margined products, you should be aware of the following points:

Most margined products can only be settled in cash. Investing in CFDs carries the same risks as investing in a future or an option or other margined products. Transactions in margined products may also have a contingent liability and you should be aware of the implications of this as set out below.

Past performance should not be considered as a guarantee of future performance as the future performance of underlying markets or funds is uncertain.

Contingent liability investment transactions, which are margined, require you to make a series of payments against the purchase price, instead of paying the whole purchase price immediately. If you trade in margined products, you may rapidly sustain a total loss of the margin you deposit with your broker to establish or maintain a position. If the market continues to move against you, you may be called upon to pay substantial additional margin at short notice (which in some cases could be a matter of minutes) to maintain the position. If you fail to do so within the time required, your position may be liquidated at a loss and you will be

CONFIDENTIAL

responsible for the resulting deficit. In certain circumstances, your clearing broker might increase the Margin rates and/or notional trading requirements at any time without notice, resulting in additional Margin that you are required to deposit to maintain your positions.

Even if a transaction is not margined, it may still carry an obligation to make further payments in certain circumstances over and above any amount paid when you entered the contract.

When you trade in derivates (such as spread bets and CFDs), you will generally be entering into an off-exchange (also known as an over-the-counter, or OTC) derivative which is non-transferable. This means you will enter into trades directly with your broker and those trades can only get closed with that broker. You will not be able to transfer or sell your open positions to other brokers.

Before you begin trading, you should obtain details of all commissions and other charges for which you will be liable. If any charges are not expressed in money terms (but, for example, as a percentage of contract value), you should obtain a clear and written explanation, including appropriate examples, to establish what such charges are likely to mean in specific money terms. For example in the case of CFDs, when commission is charged as a percentage, it will normally be as a percentage of the total contract value, and not simply as a percentage of your initial payment.

Unless your clearing broker offers guaranteed stop losses, normal stop loss or other orders are not guaranteed. Gapping or slippage can occur when the underlying market is unusually volatile and the market price moves rapidly past the price you have set your stop loss or other order. In those circumstances you will receive the next available price. For example if you had a long position in a stock at say £4.50 with a good until cancelled stop loss in place at £4.00, and overnight there was a negative announcement that caused the market price to open at £3.85, you would receive a fill at £3.85 and not £4.00.

Markets traded outside of the UK can sometimes involve greater risks. Any profits or losses arising from transactions denominated in a currency that is not your base currency may be affected by fluctuations in foreign exchange rates particularly if you are exposing yourself to a cross-currency risk. CFDs may require you to pay overnight financing costs. If you make profits or losses in currencies different to your base currency, you might be required to convert those foreign currencies into your base currency. The combination of your financing and foreign exchange costs may exceed any profits on your trade or increase the losses you incur on a trade.

Issued by The TJM Partnership PLC which is authorised and regulated by the Financial Conduct Authority FCA No. 498199

GUNDERSON 00009838

**ANNEXURE B**
**CLIENT CATEGORISATION**

Categorisation as a Professional Client

We are obliged to inform you that as a consequence of this categorisation (including where you elect such categorisation), you will lose the protections afforded to Retail Clients under the FCA.

In particular, the protections in the following areas will not apply:-

a) Financial Ombudsman Scheme
You will not have access to the Financial Ombudsman Scheme.

b) Best Execution
The way in which we will comply with the FCA's best execution requirements will differ between Professional Clients and Retail Clients. Please see our Order Execution Policy for further details of our approach in this area.

c) Disclosures
You will not be given any of the additional disclosures required to be provided to Retail Clients (for example on costs, commissions, fees and charges).

d) Prompt Execution
We do not need to inform you of material difficulties relevant to the proper carrying out of your order(s) promptly.

e) Client Assets
Protections afforded to Retail clients in relation to the segregation of their assets will not be afforded to Professional clients unless you have specifically requested segregation.

**Signature:** _Michael Ben-Jacob, Attorney-in-fact (Feb 21, 2016)_

**Email:** trading@truewindpension.com

CONFIDENTIAL

CONFIDENTIAL

GUNDERSON 00009840

# INTERNATIONAL UNIFORM BROKERAGE EXECUTION SERVICES ("GIVE-UP") AGREEMENT: CUSTOMER VERSION 2008[1]

CAUTION: THIS AGREEMENT IS DESIGNED AS A BASIC DOCUMENT FOR MARKET PARTICIPANTS ENGAGING IN "GIVE-UP" TRANSACTIONS. IT IS NOT INTENDED TO SERVE AS AN ALL ENCOMPASSING DOCUMENT FOR USE BY ALL PARTIES UNDER ALL CIRCUMSTANCES. PARTIES SHOULD CAREFULLY CONSIDER THE FULL SCOPE OF REGULATORY (INCLUDING EXCHANGE) AND COMMERCIAL TERMS THAT MAY BE APPLICABLE TO THEIR PARTICULAR CIRCUMSTANCES AND MAY ELECT TO ENTER INTO MORE DETAILED CUSTOMER AGREEMENTS AT THE OUTSET OR DURING THE COURSE OF THEIR RELATIONSHIP.

Agreement made this ___ day of _____, _____ by and among

Bastion Capital London LTD _____ ("Executing Broker")

Old Park Lane Capital PLC _____ ("Clearing Broker")

True Wind Investments LLC Roth 401(K) Plan _____ ("Customer")

1. All transactions executed orally, in writing or through an electronic order facility or cleared hereunder shall be subject to applicable laws, governmental, regulatory, self-regulatory, exchange or clearing house rules, regulations, interpretations, protocols and the customs and usages of the exchange or clearing house on which they are executed and cleared, as in force from time to time ("Applicable Law"). All disputes relating to transactions executed or cleared under this Agreement shall be governed by and settled pursuant to Applicable Law and shall be subject to the jurisdiction of the exchange (and, if applicable, its clearing house) upon which the dispute arises. The parties to this Agreement shall perform their respective obligations and exercise their respective rights under this Agreement (including, but not limited to, rejecting a Customer order, calling a Customer for margin or providing any notice specified herein) using commercially reasonable judgement, in a commercially reasonable manner under the circumstances, and consistent with Applicable Law.

2. Customer authorizes Executing Broker to execute orders for Customer as transmitted orally, in writing or through an electronic order facility by Customer to Executing Broker, or, as permitted by Applicable Law, directly to an exchange. Executing Broker reserves the right to reject an order that Customer may transmit to Executing Broker for execution and shall promptly notify Customer of any such rejection. Clearing Broker may, upon prior notice to Executing Broker and Customer, place limits or conditions on the positions it will accept for give-up for Customer's account.

3. Unless otherwise agreed in writing, each of the parties authorizes Executing Broker and Clearing Broker to use the services of one or more other persons or entities in connection with their obligations under this Agreement; provided, however, that Executing Broker and Clearing Broker remain responsible to Customer for the performance (or failure of performance) of their respective obligations and responsibilities under this Agreement.

4. Customer, whether placing orders orally, in writing or through an electronic order facility, will be responsible for accurate and valid placement of orders. Executing Broker, and not Clearing Broker, will be responsible for determining that all orders are placed or authorized by Customer. Additionally, except as otherwise agreed in writing, Executing Broker will: (a) upon placement of orders by Customer, confirm the terms of the orders with Customer if customary and practicable; (b) be responsible for the accurate execution of all orders; (c) confirm the execution of such orders to Customer as soon as is practicable thereafter; and (d) transmit such executed orders to Clearing Broker as soon as practicable, but in no event later then the period mandated by Applicable Law. Subject to Section 2 herein, Clearing Broker shall be responsible for clearing all executed orders transmitted to Clearing Broker. Unless otherwise provided by Applicable Law, neither Executing Broker nor Clearing Broker shall be responsible or liable for losses or damages resulting from: (x) error, negligence or misconduct of Customer and/or exchange or clearing house; (y) failure of transmission, communication or electronic order facilities; or (z) any other cause or causes beyond their control.

5. Executing Broker will, where applicable, bill commissions for executing trades, as elected in Section 12 below, on a monthly basis. Customer or Clearing Broker, as elected in Section 12 below, shall be responsible for verifying billing and making payment. Clearing Broker will, where applicable, pay floor brokerage fees, as well as any exchange or clearing house fees, incurred for all transactions executed by Executing Broker for and on behalf of Customer and subsequently accepted by Clearing Broker.

6. In the event that Customer disputes or denies knowledge of any transaction, Clearing Broker or Executing Broker shall be authorized to liquidate or otherwise offset the disputed position. Where practicable, prior notice of such liquidation or offset shall be provided to the other parties to this Agreement.

7. In the event that Clearing Broker does not, for any reason, accept a trade transmitted to it by Executing Broker, Clearing Broker shall promptly notify Customer and Executing Broker of such non-acceptance, and Executing Broker, or its designated clearing broker if applicable, shall at its option be entitled to:

    (a) close out Customer's trade by such sale, purchase, disposal or other cancellation transaction as Executing Broker may determine, whether on the market, by private contract or any other appropriate method. Executing Broker shall promptly notify Customer of such close out. Any balance resulting from such close out shall be promptly settled between Executing Broker and Customer; or

    (b) transfer Customer's trades to another clearing broker as instructed by Customer; or

    (c) close out Customer's trade in accordance with the following terms:

CONFIDENTIAL                                                                                      GUNDERSON 00009841

i. Customer shall be fully liable for any and all obligations arising out of or related to transactions entered into or carried in Customer's account by Executing Broker, including, but not limited to: 1) debit balances, 2) exchange or clearing house fees, and 3) brokerage, commissions, and applicable fees charged by Executing Broker;

ii. Executing Broker shall have the right to call Customer for margin in such amounts, in such form, by such time and in such manner as may be required by Executing Broker. If Customer fails to meet such margin call within such specified time, or if Executing Broker, in its discretion, otherwise deems it appropriate for Executing Broker's protection, Executing Broker may close out Customer's trade pursuant to sub-paragraph (a) above;

iii. Customer acknowledges that Customer's trades may be subject to exercise or delivery assignments, where applicable.

8. Customer acknowledges that all notices and disclosures that are provided by Clearing Broker to Customer (or Customer's representative) pursuant to Applicable Law, will be deemed, for purposes of Section 7 of this Agreement, as if received by Customer from Executing Broker as well as from Clearing Broker. Clearing Broker represents, warrants and covenants to Executing Broker that it has provided, and will provide, all required notices and disclosures to Customer (or Customer's representative).

9. This Agreement may be terminated by any of the parties hereto upon prior written notice to the other parties. Any such termination shall have no effect upon any party's rights and obligations arising out of transactions executed prior to such termination.

10. This agreement shall be exclusively governed by, and construed in accordance with, the laws of the jurisdiction specified below without regard to principles of choice of law.

11. This Agreement shall not amend or vary any clearing or electronic services agreement between Clearing Broker and Customer or Executing Broker and Customer. In the event of a conflict between this Agreement and such other clearing or electronic services agreement with respect to the execution, clearing or carrying of Customer's trades, such other clearing or electronic services agreement will control with respect thereto.

12. Executing Broker, where applicable, will bill commissions per contract per half turn as specified on attached Addendum, rate schedule, or as separately agreed.

13. Each party consents to the electronic recording, without the use of an automatic warning tone, of all telephone conversations between or among the parties and their representatives.

14. Unless otherwise prohibited by Applicable Law, any party to this Agreement, from time to time, may add additional accounts of Customer to be governed by this Agreement by prior written notice (which may be by facsimile or other electronic transmission) to the other parties, provided that (i) the same fees agreed to herein apply and (ii) valid clearing accounts for such accounts exist at the Clearing Broker.

15. This Agreement may be executed and delivered in counterparts (including by facsimile or other electronic transmission), each of which will be deemed an original.

**Jurisdiction:** England and Wales

---

[1] This Uniform Agreement was prepared in consultation with the FIA, FOA and MFA. Any changes or additions to the wording of this standard document must be clearly indicated. Failure to do so constitutes a representation that the document is the International Uniform Brokerage Execution Services ("Give-Up") Agreement: Customer Version 2008 and has not been modified in any respect.

*Any party that has manually executed this Agreement represents, covenants and agrees that the version electronically executed by the other parties and stored on EGUS is the final version and sets forth the complete terms and conditions as agreed to by all of the parties.*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective authorized officers as of the date set forth above.

Name of Executing Broker: Bastion Capital London LTD
By: _____

Name of Clearing Broker: Old Park Lane Capital PLC
By: _____

(CUSTOMER FORM 201 - 10-95, revised December 2005 and April 2008)
© Futures Industry Association, Inc. 2008

CONFIDENTIAL                                                                                        GUNDERSON 00009842

Name of Customer: True Wind Investments LLC
Roth 401(K) Plan
By: _B̲J̲.̲ ̲M̲R̲X̲,̲ ̲a̲t̲t̲o̲r̲n̲e̲y̲-̲i̲n̲-̲f̲a̲c̲t̲_

CONFORMED SIGNATURES WERE EXECUTED ELECTRONICALLY IN ACCORDANCE WITH THE FIA ELECTRONIC GIVE-UP
AGREEMENT SYSTEM USER AGREEMENT.

CONFIDENTIAL                    GUNDERSON 00009843

## ADDENDUM TO INTERNATIONAL UNIFORM BROKERAGE EXECUTION SERVICES ("GIVE-UP") AGREEMENT

### MADE THIS ___ DAY OF _____, _____

### CONTACT PERSONS

*Any notices or problems regarding these transactions should immediately be brought to the attention of the contact persons of each of the parties hereto, whose names, addresses, and numbers are set forth below. Each party may change its operational contact by notice to the others.*

*Executing Broker*                          *Clearing Broker*

*For Documentation*
Name:  Bastion Capital London LTD
Name of Person:  Adrian Milne
Address:  4th Floor,
27-32 Old Jewry,
London, EC2R 8DQ
United Kingdom
Telephone No.:  +44 (0) 7866774716
Fax No.:
Email:  adrianmilne@bastioncapital.co.uk

*For Documentation*
Name:  Bastion Capital London LTD
Name of Person:  Patrick Milne
Address:  4th Floor,
27-32 Old Jewry,
London, EC2R 8DQ
United Kingdom
Telephone No.:  00447866774717
Fax No.:  -
Email:  patrickmilne@bastioncapital.co.uk

*Customer*

*Customer's Account Number*

| Account ID | Account Description | Effective Date | Expiration Date |
|---|---|---|---|
| TBC | | | |

### BILLING ADDRESS

*Invoices to be sent to the address set forth below.*

Bill To Party Name: **True Wind Investments LLC Roth 401(K) Plan**

Address: **Select Country**

Attention:

CONFIDENTIAL                                    GUNDERSON 00009844

4th Floor, 27-32 Old Jewry, London, EC2R 8DQ
front office: 020 7444 4100   back office: 020 7621 0924
fax: 020 7726 8042
info@bastioncapital.co.uk   www.bastioncapital.co.uk



bastion capital london

23 July 2014

Old Park Lane Capital Plc
49 Berkeley Square
Mayfair
London
W1J 5AZ

Dear Sirs

Fee rate agreement schedule for Old Park Lane Capital Plc

I write to confirm our fee schedule for trades arranged by us and cleared by you:

- 0.125bp applied to the nominal value of equity buy trades

- 0.125bp applied to the nominal value of equity sell trades

- 0.125bp applied to the nominal value of futures buy trades

- 0.125bp applied to the nominal value of futures sell trades

Yours faithfully

Patrick Milne
CEO and authorised signatory
Bastion Capital London Ltd

(CUSTOMER FORM 201 - 1995, revised December 2006 and April 2008)
© Futures Industry Association, Inc. 2008

FIA EGUS Agreement ID 313989    Page 5

**CONFIDENTIAL**                                                                 **GUNDERSON 00009845**

CONFIDENTIAL